STATE EX REL. COOK and others, vs. HOUSER, Secretary of State.

*September 16—October 5, 1904.*

*Political conventions: Split: Double nominations: Right to party name on official ballot: Supreme court: Original jurisdiction: Political or judicial question: Remedies: Mandamus or injunction: Special tribunal to determine factional disputes: Statute construed: State central committee: Disqualification by prejudice or interest: Decision by national convention: Highest party authority.*

Those claiming seats in the Republican state convention called to choose state nominees to go on the official ballot at the next general election and delegates to the next Republican national convention, having organized in two bodies, each claiming to be regular and executing the purposes of the call, and such national convention having decided the contest thus created, so far as it affected that body, and thereafter the state nominees on the side so held to be right having caused a suit to be commenced in this court in the name of the state against the

State ex rel. Cook v. Houser, 122 Wis. 534.

secretary of state for a mandatory injunction, claiming in the complaint that unless the court interfered such nominees would be irreparably injured by the defendant's recognizing as regular, in certifying names for the official ballot, the convention held by the national body to be irregular, and alleging facts tending to show that the other convention was composed of a majority of those entitled to execute the purposes of the aforesaid call and that the decision of the national body was conclusive as to the right of the matter, and the defendant having answered, alleging facts tending to show that the convention held by the national convention to be irregular was composed of a majority of those entitled to execute the purposes of the call; that sec. 35, Stats. 1898, provides the sole remedy for determining such disputes; and that the tribunal therein referred to had assumed jurisdiction of the matter; and plaintiff by amendment having alleged that such tribunal was disqualified because of the prejudice and indirect interest of its members, but that nevertheless such tribunal had assumed to act in the matter and had decided contrary to the decision of the national convention, and upon defendant's admission that such national convention had passed upon the dispute, as alleged, plaintiff's counsel having moved the court for judgment as prayed for in the complaint and upon the obvious fact of the existence of sec. 35 and the tribunal therein referred to, and the admission that it had assumed jurisdiction of the dispute, defendant's counsel having moved the court to dismiss the complaint for want of jurisdiction. *Held:*

1. The controversy shown to exist by the statement sufficiently concerns the prerogatives of the state and affects the liberties of the people, to be within the original jurisdiction of this court.

2. Such controversy is of so grave a character and of such public importance, as to warrant this court in exercising its original jurisdiction to determine the right of the matter, so far as the door is open for it to do so.

3. Since the question presented merely involved the duty of the secretary of state in the performance of an act expressly enjoined by law, it is a judicial one.

4. For the present case, the time not having arrived when the secretary of state is required to make certification of the nominations, by the general rule, there is no remedy at law by *mandamus;* hence the action, if maintainable at all, is properly brought in equity, if the legislature has not furnished another and exclusive remedy.

5. The legislature intended to provide for settlement, out of court, of all questions between factions of a party concerning

the right to the party name upon the official ballot, by sec. 35, Stats. 1898, in these words:

(*a*) "In case of a division in any political party, and a claim by two or more factions thereof to the same party name, the officer with whom the certificates of nomination are required to be filed shall, in certifying such nominations or preparing ballots, give preference of name to the convention or caucus thereof held pursuant to the call of the regularly constituted party authorities, and if the committee representing the other faction present no other party name, such officer may designate the same in such manner as will best distinguish the nomina-tions thereof."

(*b*) "When two or more conventions or caucuses shall be held and the nominations thereof certified, each claiming to be the regular convention or caucus of the same political party, preference in designation shall be given to the nominations of the one *certified by the committee which had been officially certified to be authorized to represent the party.*"

6. The first clause provides for a case where only one of two or more conventions is claimed to have been held upon the call of the regular party committee, and the identity of that one is, therefore, not in doubt. The second clause provides for a case where all of the conventions are claimed to have been held pursuant to the call of such and the same committee, by creating a tribunal to decide, for the guidance of the secretary of state, which set of nominees is regular and, therefore, entitled to the use of the party name, such tribunal possessing by familiar rules exclusive and final jurisdiction, save as hereinafter stated.

7. The first clause of sec. 35, Stats. 1898, cannot apply to this case, because the dominant feature thereof is the existence of multifarious "*claims to the same party name*," determinable, as before indicated, by the certifying officer from his own records, showing the necessary source of regularity.

8. While the dominant feature of such first clause is the existence of multifarious "*claims to the same party name*," one of such claims only being based on the "*call of the regularly constituted party authorities*," the dominant feature of the second clause is the existence of multifarious "*claims to the same party name*" based on like claims to regularity of party convention, each of the claimants referring necessarily to the "*call of the regularly constituted party authorities*" as in the case at hand.

9. The instant controversy comes clearly within the second clause of said sec. 35, answering as it does every call thereof.

(*a*) Two conventions were held.

(*b*) Each of said conventions made nominations.

(*c*) Such nominations were duly certified.

(*d*) Each of said conventions claimed to be the regular convention of the Republican party.

State ex rel. Cook v. Houser, 122 Wis. 534.

10. It was competent for the legislature in authorizing an official ballot, and granting to party nominees a right to have their names placed thereon under the party designation, to subject that right, in case of a controversy between two or more sets of nominees, each claiming the same and such designation, to the decision of a party tribunal, as in said sec. 35,

11. The creation of a tribunal to determine such controversies, no provision being made for a judicial review of its decisions, necessarily makes its jurisdiction exclusive and its decisions unimpeachable, except for jurisdictional defects.

12. The tribunal answering to the call of said sec. 35, is found to exist in the Republican state central committee, elected at the state convention of 1902, and duly certified to the secretary of state under sec. 31, Stats. 1898; therefore, the jurisdiction of this court is limited to deciding whether such committee was or is without jurisdiction because of bias or interest of some of its members, or whether its decision is affected by jurisdictional defects.

13. Such tribunal, though required to act judicially, being an administrative rather than a judicial body, bias or interest of its members does not disqualify them nor affect its jurisdiction.

14. The decision of the national Republican convention, as to which of the two sets of delegates from this state, claiming the right to represent the Republican party thereof in such convention, was entitled to recognition, is not of any significance, as a guide to the secretary of state or the committee authorized to determine the factional dispute under said sec. 35, since the exclusive jurisdiction thereof, as regards the official ballot law, was conferred by the legislature upon the latter as a special tribunal, as before indicated.

15. As soon as the nominations were made by the two conventions and duly certified, the rights of the nominees to places upon the official ballot under the designation "*Republican Ticket*," became vested in them as the representatives of their respective organizations, subject to the decision of the special tribunal aforesaid, as to which of the conventions was regular, and such right could, therefore, not be in any way affected by the determination of any other tribunal.

16. Sec. 35, Stats. 1898, contemplates, in all cases mentioned therein of conflicting claims to the use on the official ballot of a particular party designation, that one set of the claimants shall be given preference thereto, and each of the others have a place upon the ballot under a designation sufficiently different from that accorded to the rightful claimants of the particular designation, to enable the electors to distinguish each set of irregular from the regular nominations.

17. The tribunal created by law to determine the factional· dispute in question for the guidance of the secretary of state, having assumed jurisdiction thereof and decided, free from jurisdictional infirmities, that the nominations headed by Robert M. La Follette for governor are entitled to preference in. respect to the use upon the official ballot of the name "Republican Ticket," it is the duty of the secretary of state to act accordingly, certifying both sets of nominations to the various· county clerks, but giving to those headed by Robert M. La: Follette for governor, preference as aforesaid.

18. The foregoing conclusion follows, logically and necessarily, from the legal aspects of the case before stated. What, the real right of the matter in dispute might be found to be; were this court permitted to disregard the decision of the· special tribunal and investigate and determine the merits of' the controversy from that standpoint, it has no right to decide or suggest. Duly ·constituted authority having spoken within its jurisdiction, it must be conclusively presumed here to have spoken rightly.

[Syllabus by the Court.]

*Additional syllabus by* MARSHALL, J.:

1. This court has full jurisdiction to hear and determine· every question involved in a case of this sort.

2. Whether the circumstances of the make-up and organization of several conventions, each claiming to be the regular convention of the same political party, make this or that one· regular in fact is not involved in a judicial investigation as· to the right of the nominees of either to go upon the official ballot, that being left to the special tribunal under sec. 35,. Stats. 1898.

3. The basic principle of the doctrine that courts, in solving; the right of political party disputes as regards the execution of the election laws, should be guided by the decision of the highest authority within the party, is the law as to judicial treatment of the decisions of tribunals of voluntary organizations generally.

4. A law which expressly, or by necessary implication, provides that a particular party committee or other tribunal shall have sole authority to determine the right of the matter as to several nominations by different conventions for the same office, each convention claiming to be the regular convention of the same political party, merely gives legislative approval to the doctrine that party disputes should be settled by the highest authority within the party.

5. The principle of such a law is to recognize the doctrine of courts that the highest authority within the party should speak for the party as in the manner of voluntary organizations generally, but to preclude any necessity for courts to determine where that authority is to be found.

6. The common-law disqualification applied to judges has no application to the members of a *quasi*-judicial tribunal acting judicially in dealing with administrative matters.

7. If the rule were the reverse of what is above stated, mere prejudice would not constitute a disqualification, since interest, and kinship to some one of the parties, are the sole common-law disqualifications.

8. Interest, within the rule last stated, refers to direct pecuniary interest.

9. All common-law rules as to the disqualification of judges give way to the stern rule of necessity, permitting one to act judicially though he would be disqualified otherwise, if, were he not to act, there would be no tribunal to furnish a remedy for the case in hand.

10. Where a majority of the members of a tribunal, answering to the calls of sec. 35, Stats. 1898, are so circumstanced that they would be disqualified from acting if the rule as to the disqualification of judges were to be applied to them, it could not be so applied, the above-mentioned rule of necessity precluding it.

CASSODAY, C. J., dissents.

ACTION, commenced in this court, for an injunction against the Secretary of State.

This cause was submitted for decision on motions made by counsel for the respective parties upon the complaint and answer. The pleadings, so far as necessary to the application of the principles which rule the cause, omitting details, are to this effect:

1. On the part of the relators: That the duly called and held convention of the Republican party of the state of Wisconsin for the purpose of nominating candidates for the various state offices to be filled at the general election in 1904, and presidential electors to be chosen at the same time, and also delegates to the national Republican convention, to be held to place in nomination a candidate for the office of president of

the United States, and a candidate for the office of vice president thereof, duly performed all such functions, a majority of all the delegates qualified therefor participating therein, resulting, among other things, in the choice of the relators as candidates for said state offices, headed by *Samuel A. Cook* for governor, and the election of a state central committee for the ensuing year; that such proceedings were subsequently duly taken pursuant thereto that certificates were duly made evidencing the facts aforesaid as to candidates nominated for state offices and presidential electors, preparatory to the filing thereof with the secretary of state; that there will be filed with the secretary of state other certificates, in due form, purporting to show, but falsely nevertheless, that an assemblage of delegates different from the one aforesaid, was the regular Republican convention to perform the functions aforesaid; that such two conventions occurred by a division between those responding to the regular party call for an assemblage of delegates for the purposes aforesaid, owing to a dispute as to the qualifications of some persons so responding; that such pretended convention nominated for such state offices a ticket headed by Robert M. La Follette as candidate for governor, and also nominated a requisite number of candidates for presidential electors, and elected delegates at large to the national Republican convention aforesaid; that subsequently to such occurrences the said national Republican convention, held at Chicago June 21, 1904, the highest party authority competent to determine which of the two state conventions was duly authorized to represent the Republican party of the state of Wisconsin in the performance of the functions aforesaid, upon a due presentation of the matter, in a contest between the two sets of delegates elected as aforesaid to such national convention, decided in favor of those placed in nomination by the convention which nominated the relators; that such relators can only secure the places to which they are en-

titled upon the official ballot forms to be used at the next general election, to wit, in the column headed "Republican Ticket," by the certification of their names by the secretary of state to the various county clerks, as constituting such party ticket, which act such secretary of state may properly do as late as fourteen days before the date of the election; that the defendant is the person nominated by said pretended convention as candidate for the office of secretary of state, which office he now holds; that he claims that he and his associate nominees were nominated at the only regular Republican state convention authorized to act in the matter, and are entitled to have their names go upon the official ballot forms in the column headed "Republican Ticket," notwithstanding the decision of the national Republican convention, as aforesaid, respecting which of said two state conventions was regular; that he has pronounced said decision ineffective, and threatens to ignore it by certifying to the county clerks of the various counties the names of himself and associate nominees, to go upon the official ballot forms under the designation "Republican Ticket," for use at the next general election, and will do so to the irreparable injury of the relators, unless restrained therefrom by the court; that the relators have no remedy to prevent such threatened wrong, other than such as a court of equity can afford; that they have not applied to the attorney general to act in this matter, because of the fact that he is adversely interested, in that he is one of the associate nominees of the defendant.

2. On the part of the defendant, in addition to putting in issue the allegations of the complaint as to the relators being the regular Republican nominees, and the defendant and his associates irregular nominees: that the convention at which Robert M. La Follette and his associates were placed in nomination as alleged in the complaint was, as it assumed to be, the only duly called and held Republican state convention for

the purposes stated in the call alleged in the complaint; that
it was composed of a majority of all delegates responding to
the regular party call and qualified to participate in such
convention; that the persons nominated thereat are the only
ones duly authorized to represent the Republican party upon
the official ballots under the designation "Republican Ticket,"
to be used at the coming general election; that certificates of
nomination, in due form of law, showing such facts have been
duly made and will seasonably be filed with the secretary of
state; that such nominations will be treated as regular regard-
less of the alleged action of the national Republican conven-
tion, its decision being regarded as entirely without authority
as regards the performance of his duty; that sec. 35, Stats.
1898, provides that when a conflict shall arise as to the use
of a particular party designation by the holding of two con-
ventions, "each claiming to be the regular convention of the
same political party," and certification of nominations to the
secretary of state by both, that he shall "give preference in
designation" in certifying names for the official ballot, to
the nominees of the convention "certified by the committee
which had been officially certified to be authorized to repre-
sent the party"; that the defendant upon being informed
that a condition would arise requiring him to take advice of
said committee as to which of the two sets of nominees afore-
said should have the preference in designation as the nom-
inees of the Republican party, invoked it to take jurisdiction
of the matter; that in compliance with such request said com-
mittee duly assembled and took such jurisdiction; and that
when it shall have duly exercised its function in the matter
he will abide by the result in the performance of the duty de-
volving on him to certify the names of nominees to the various
county clerks to be put on the official ballot under the desig-
nation "Republican Ticket."

3. Further, by way of amendment to the complaint, it is
made to appear that the committee mentioned in the answer

was originally composed of twenty-two members; that it was chosen at the Republican convention held in 1902; that before it convened, as alleged in the answer, three of the members thereof resigned therefrom by filing resignations with the chairman thereof, who thereafter appointed successors in their places, the appointments being subsequently confirmed by the committee; that when the committee met, as alleged, only thirteen were present; that the relators appeared before it and specially objected to any proceedings being taken in regard to the matter referred to it for adjudication, because of its having been superseded by a new state central committee elected at the Republican convention of 1904; that a majority of the committee were disqualified because of prejudice in respect to the matter to be determined, their own conduct being the cause of the controversy and necessarily a subject for investigation and approval or condemnation; and that as a proper tribunal to settle such factional dispute such committee was unknown to the statute and without jurisdiction.

4. The motion of the plaintiffs was for judgment as prayed for in the complaint, i. e., in substance, that the names of the relators and of those nominated at the same convention with them as presidential electors, be certified to the various county clerks, as provided by law, as the persons to be placed upon the official ballot forms for use at the coming general election under the designation "Republican Ticket."

5. The motion on the part of the defendant was for a dismissal of the complaint for want of jurisdiction of the court over the subject matter.

*J. M. Olin* and *H. L. Butler,* attorneys, and *George G. Greene,* of counsel, for the plaintiff, contended, *inter alia,* that the old state central committee is disqualified to act. In certifying as to which of two conventions is the regular convention under the second clause of sec. 35, the state central committee acts judicially. *State ex rel. Ellis v.*

*Thorne,* 112 Wis. 81, 87; *Land, L. & L. Co. v. McIntyre,* 100 Wis. 258; *State ex rel. Getchel v. Bradish,* 95 Wis. 205; *Larkin v. Noonan,* 19 Wis. 82; *Randall v. State,* 16 Wis. 340; *State ex rel. Moreland v. Whitford,* 54 Wis. 150; *Steele v. Dunham,* 26 Wis. 393; *Ex parte Sanders,* 53 S. C. 478, 31 S. E. 290. "It is a maxim in every code, in every country, that no man should be a judge in his own cause." *Washington Ins. Co. v. Price,* 1 Hopk. Ch. 1; *Case v. Hoffman,* 100 Wis. 314, 335. "The principle of disqualification is to have no technical or strict construction, but is to be broadly applied to all classes of cases where one is appointed to decide the rights of his fellow citizens." 12 Am. & Eng. Ency. of Law, 41; *Stockwell v. White Lake,* 22 Mich. 341, 345; *People ex rel. Pond v. Trustees,* 39 N. Y. Supp. 607; *State ex rel. Getchel v. Bradish,* 95 Wis. 205. It will be applied to all bodies exercising judicial or *quasi*-judicial functions. *Land, L. & L. Co. v. McIntyre,* 100 Wis. 258, 262. It should be more broadly applied in a case where, as here, there is no appeal from the determination of the body vested with the judicial function. *State ex rel. Barnard v. Board of Education,* 19 Wash. 8, 40 L. R. A. 317, 319. The last proposition finds support also in the rule of the common law that the disqualification of a member of such body renders its judgment void, while the decision of the judge from which an appeal was allowed is voidable only. 17 Am. & Eng. Ency. of Law (2d ed.) 742. The tendency should be to enlarge rather than restrict the principle of disqualification. *Queen v. Huggins* (1895) 1 Q. B. 563; *Stockwell v. White Lake,* 22 Mich. 341, 349. This tendency is shown by the broad construction placed by courts upon disqualifying statutes or constitutional provisions. *Hall v. Thayer,* 105 Mass. 219; *Williams v. Robinson,* 6 Cush. 333. And by the decisions which have held incompetent, judges who were related by affinity only, as, for example, as father-in-law or brother-in-law, to those interested in the litigation, though not parties to it. *Hall v. Thayer,* 105 Mass. 219; *Taylor v. Comm'rs,*

105 Mass. 225; *Bayard v. McLane,* 3 Har. 139; *Gains v. Barr,* 60 Tex. 676; *Spencer v. Maloney,* 28 Colo. 38, 62 Pac. 850; *In re Taber,* 13 S. Dak. 62, 82 N. W. 398; *Hibbard v. Odell,* 16 Wis. 633; *Elderkin v. Wiswell,* 61 Wis. 498. Pecuniary interest, no matter in what degree, disqualifies at the common law, "and any interest, though not pecuniary, will have the same effect, if it be sufficiently substantial to create a reasonable suspicion of bias." Broom's Legal Maxims (7th ed.) 94. This rule has been applied in England in numerous cases where there was no pecuniary interest, and to *quasi*-judicial officers and bodies. *Queen v. Meyer,* 1 Q. B. Div. 173; *Leeson v. General Council,* 43 Ch. Div. 366; *Allinson v. General Council* (1894) 1 Q. B. 750; *Queen v. Burton* (1897) 2 Q. B. 468; *Queen v. Huggins* (1895) 1 Q. B. 563; *Queen v. Justices of Yarmouth,* 8 Q. B. Div. 525. The principle of disqualification established by these cases has been adopted by this court. *State ex rel. Getchel v. Bradish,* 95 Wis. 205; *State ex rel. Starkweather v. Common Council,* 90 Wis. 612. See, also, *State ex rel. Barnard v. Board of Education,* 19 Wash. 8, 40 L. R. A. 317; *People ex rel. Pond v. Trustees,* 39 N. Y. Supp. 607; *Williams v. Robinson,* 6 Cush. 333; *Phillips v. Curley,* 28 Colo. 34, 62 Pac. 837; *MacMillan v. Spencer,* 28 Colo. 80, 62 Pac. 849. The alleged wrongful and arbitrary conduct of the old state central committee is the issue to be determined by them. They must determine whether they had the right to exclude from the gymnasium convention and from participation in the temporary organization of that convention, duly credentialed delegates, and to seat others in their places. Is the body thus charged with having so wrongfully acted to be the judge of the truth of those charges? Even in those jurisdictions where the judge of a court is permitted to sit in the appellate court in review of his decisions below, it would not be tolerated that, were he charged with having rendered a decision below in bad faith or through prejudice, he should

be permitted to sit upon the appellate bench to determine the charges thus made against him. *Allinson v. General Council* (1894) 1 Q. B. 750, 762; *Queen v. Meyer,* 1 Q. B. Div. 173; *Queen v. Henley* (1892) 1 Q. B. 504; *Leeson v. General Council,* 43 Ch. Div. 366; *Queen v. Burton* (1897) 2 Q. B. 468; *State ex rel. Barnard v. Board of Education,* 19 Wash. 8, 40 L. R. A. 317; *People ex rel. Pond v. Trustees,* 39 N. Y. Supp. 607. The old state central committee consisted of twenty-two members. A majority, or twelve, must concur in any decision which the committee may make. Subd. 3, sec. 4971, Stats. 1898; *Pickett v. School Dist.* 25 Wis. 551, 557; *State ex rel. Meredith v. Lippels,* 112 Wis. 203, 210; *Spencer v. Maloney,* 28 Colo. 38, 62 Pac. 853. In the present case, there are more than twelve disqualified members of the committee. Hence, in no event could the committee make any valid decision. But the disqualification of the majority is not essential. If one of the members sitting with the committee is incompetent to act, the whole proceeding before the tribunal is *coram non judice.* *Queen v. Hertfordshire Justices,* 6 Q. B. 753; *Queen v. Suffolk Justices,* 18 Q. B. 416; *Queen v. Meyer,* 1 Q. B. Div. 173; *Queen v. Huggins* (1895) 1 Q. B. 563; *Queen v. London Co. Council* (1892) 1 Q. B. 190; *Leeson v. General Council,* 43 Ch. Div. 379; *Queen v. Justices of Yarmouth,* 8 Q. B. Div. 525; *Peninsular R. Co. v. Howard,* 20 Mich. 18; *State v. Crane,* 36 N. J. Law, 394; *Converse v. McArthur,* 17 Barb. 410; *Oakley v. Aspinwall,* 3 N. Y. 547; *Stockwell v. White Lake,* 22 Mich. 341, 350; *Sanborn v. Fellows,* 22 N. H. 473. The foregoing rule has been adopted in this state. *State ex rel. Getchel v. Bradish,* 95 Wis. 205; *Case v. Hoffman,* 100 Wis. 314, 357; *Pickett v. School Dist.* 25 Wis. 551. It cannot be said that the statute vests exclusive jurisdiction in the committee, and that they must of necessity be the judges even though interested. This principle, if applied at all, is only applied where, if the interested tribunal does not act, the rights of the parties must

go undetermined. It is applied only to prevent a failure of
justice. *Case v. Hoffman,* 100 Wis. 314, 357. It seems
a contradiction in terms to say that a person must submit
to the injustice of having his rights determined by an inter·
ested tribunal in order to prevent a failure of justice, and it
has been said to be far better that a cause should remain un-
·determined until the legislature can provide an appropriate
tribunal for its decision, than that the principle which de-
mands complete impartiality in a judge should ever be vio-
lated. *Oakley v. Aspinwall,* 3 N. Y. 547, 550; *State v. Crane,*
36 N. J. Law, 394; *People ex rel. Pond v. Trustees,* 39 N. Y.
Supp. 607. But here, the incompetency of the tribunal does
not work a failure of justice, because the subject matter of
the jurisdiction is one which, apart from the statute, is within
the jurisdiction of the court, and the statute will be con-
strued as vesting jurisdiction in the committee, providing a
·committee exists which is qualified to act judicially. *Oakley
v. Aspinwall,* 3 N. Y. 547, 553; *Stockwell v. White Lake,*
22 Mich. 341, 345; *Queen v. Lee,* L. R. 9 Q. B. Div. 394.
A construction of a statute which would compel parties to
submit their rights to a biased tribunal would make it a
statute against common right and unconstitutional. Cooley,
Const. Lim. (6th ed.) 548; *State v. Crane,* 36 N. J. Law,
·394; *Peck v. Essex,* 21 N. J. Law, 656; *Lanfear v. Mayor,*
2 La. 445, 23 Am. Dec. 477. On the question of regularity
this court should follow the decision of the national Repub·
lican convention, that decision being by the highest authority
in the party. *State ex rel. Buttz v. Liudahl,* 11 N. Dak. 320,
91 N. W. 950; *In re Woodworth,* 16 N. Y. Supp. 147;
S. C. 19 N. Y. Supp. 525; *In re Redmond,* 25 N. Y. Supp.
381; *In re Pollard,* 25 N. Y. Supp. 385; *In re Fairchild,*
151 N. Y. 359; *Cain v. Page,* 42 S. W. 336; *Moody v.
Trimble,* 58 S. W. 504, 50 L. R. A. 810; *Davis v. Hambrick,*
109 Ky. 276, 58 S. W. 779, 51 L. R. A. 671; *State v.
·Lesueur,* 103 Mo. 253, 15 S. W. 539; *Stephenson v. Boards*

*of Election Comm'rs,* 118 Mich. 396, 76 N. W. 914, 42
L. R. A. 214; *State ex rel. Gronvold v. Porter,* 11 N. Dak.
309, 91 N. W. 944.

*H. W. Chynoweth,* attorney, and *I. L. Lenroot, R. M.*
*Bashford,* and *John Barnes,* of counsel, for the defendant.

On October 5, 1904, the court announced its decision,
which is embodied in the preceding syllabus by the court
and statement of facts, and in the mandate following the
opinion of the court by MARSHALL, J. SIEBECKER, J., took
no part in the decision.

On October 20, 1904, the following opinion was filed:

MARSHALL, J. At the outset in writing this opinion it
seems proper to say that the court at no time since the cause
was submitted has been insensible to the intense anxiety of
the people of this state for a speedy determination of the
important questions involved. That anxiety fully justified,
if it did not do more, giving the cause preference over all
ordinary business here and it has been given that preference.
Obviously in such an important matter neither the circum-
stance referred to nor any other could have justified haste
in reaching a decision, impairing the ability of the mem-
bers of the court, individually, to carefully study and con-
sider the arguments of the eminent counsel who, in their
appropriate field as officers of the court, have aided it in
arriving at a correct result. Such careful consideration of
the arguments of counsel required the examination of a multi-
tude of authorities cited therein, and authorities in great
number not so referred to. Time for that careful study was
due to those who must in the future bear the responsibility
for the result. It was due to the court which stands for jus-
tice in our commonwealth, so far as it is given to men to
effect it, laboring conscious of no thought other than to dis-
cover and to declare what is right, and to condemn what is
wrong. It was due to the people at large, whose interests

of a most vital character were at stake; and lastly it was due to the private parties to be directly affected by the decision. All who put the public welfare above mere private considerations or mere curiosity will fully appreciate what is thus said. Those disappointed with the final result, as well as those who are not, together with the great mass of conservatives waiting without bias to embrace as truth that which shall be judicially declared to be such, will obtain satisfaction in the reflection that by due process of law the right of the controversy which has disturbed the people in every section of the state, and reached outside thereof to a greater extent than any matter of difference which has heretofore existed originating within its boundaries for a generation, has been judicially declared as a result of all the deliberation and thorough investigation which could be devoted thereto with any reasonable probability of obtaining light upon the issues involved. It is of course to be regretted that in a matter of such public importance the end reached cannot rest upon the collective judgment of all the members of the court. That has been appreciated here to a high degree and to the care exercised to obtain, so far as possible, a definite understanding of every judicial thought interfering therewith, and to weigh it carefully in all its aspects, must be attributed much of the time that elapsed between the submission of the cause and the decision thereof. It is due to the court that all such thoughts which were found upon consideration not to justify a different conclusion than the one reached should receive attention in the opinion upon which the judgment is grounded, and it is quite proper that further attention should be paid thereto in concurring opinions adding emphasis to what may be said for the court, so that the truth judicially declared, may stand, so far as possible, as truth judicially demonstrated to voice the law so plainly as to close up every avenue for reaching a different conclusion.

With the foregoing prefatory remarks we will take up the

various questions directly or incidentally involved in this litigation and necessary or proper to be determined in reaching a decision.

Whether the cause of the plaintiff is within the original jurisdiction of this court, using the term "jurisdiction" in its strict sense, that of power as distinguished from mere judicial rules as to when it may be exercised in equity or at all, is determinable without difficulty by the test which has been so firmly established by a long line of decisions in this court, that it is as well known in its general scope as any legal principle that could be mentioned.

The cause involves the interpretation and enforcement of a legislative enactment in which all the people of the state are vitally interested. The question at issue is *publici juris* in the highest degree. The chief interest therein is not only public but extends to every section of the state in substantially an equal degree. It involves the correct enforcement of the legislative plan, making political parties important state agencies in the selection of candidates for public offices, incidentally in determining the policy which shall guide such officers in the performance of their official duties, and in the selection at the ballot box from those primarily named of persons to fill such offices. The theory of such plan is that a political party, so long established as to come within its provisions, stands for some distinct policy in public affairs, which is so identified with the party name that its candidates should have the exclusive use thereof as a characterization of such policy and the relations of its candidates thereto, upon the official ballot. It contemplates that candidates for office named on the official ballot stand for principles of supposed public concern, to be indorsed or condemned by the electors according as they shall indicate their opinions in respect thereto, by their votes for or against them as the personal representatives thereof. It contemplates that such principles are of paramount importance in determining elections; hence that

every candidate should be known upon the official ballot by his particular party association, he having but one such association, and therefore entitled to but one place on such ballot. *State ex rel. Runge v. Anderson,* 100 Wis. 523, 76 N. W. 482. The exclusive use of the party name by a particular organization, after it has achieved such significance as to be entitled to recognition as one specially privileged to appear on the official ballot, was evidently deemed by the legislature to be a matter of vital importance to such organization, to the candidates named by it, and to the people of the state at large. It was thought to be necessary to the integrity of the organization, and important to the people generally as an indication of the principles to prevail contingent upon the candidates bearing its stamp, so to speak, being elected. It was thought to be a matter of the highest importance to the electors, to the end that they might not be misled into indorsing principles in form to which they were opposed in fact. All that seems fairly implied by the general features of the plan. So the sovereignty of the state as to the regulation of elections, the liberty of the electors to organize for political purposes, their right to the preservation of party integrity, the same as in the case of any voluntary organization, the opportunity to render legitimate organized effort to a political end effective, and the very vital principle itself of our entire scheme of constitutional government, the security of life, liberty, and the pursuit of happiness, is involved in the correct understanding and administration of such legislative plan. The common practice where the people are privileged, or have reserved unto themselves the right, to shape governmental policies through the agency of political parties, the common judgment that strong party organizations, in which the will of the individual elements is deemed to be fairly reflected by its representatives, promote good government, is significantly embodied therein. Therefore, a controversy involving the vital principles thereof, it would seem, plainly satisfies the test of

the original jurisdiction of this court. That, as it is said, "extends to all judicial questions affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of the people." *In re Court of Honor,* 109 Wis. 625, 85 N. W. 497, and cases therein referred to. That the comprehensive language, early used as circumscribing such original jurisdiction, includes the particular matter in hand, seems plain.

If there could be any doubt but that the conclusion above suggested is right a reference to previous decisions of this court effectively removes it. In *Att'y Gen. v. Blossom,* 1 Wis. 317, this court declared, in effect, that its original jurisdiction affords a remedy for the unauthorized exercise of power, which only the legislature, acting within constitutional restraint, can give; that it is the duty of the state to preserve pure and unimpaired every channel and agency through which its power is exercised or administered, and rebuke in the most speedy manner consistent with individual rights any and all who assume its name or usurp its authority or seize upon its franchises; and that such power effectively lodged somewhere, is necessary to preserve the liberties of the people and to secure the rights of its citizens. In *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, a violation by railway corporations of a law regulating the enjoyment of their franchises was held to be a subject proper to be dealt with here in the first instance. In *Att'y Gen. v. Eau Claire,* 37 Wis. 400, the alleged abuse of a public watercourse, title to which was in the state in trust for the whole people thereof, was held to be such a subject. In *State ex rel. Att'y Gen. v. Cunningham,* 81 Wis. 440, 51 N. W. 724, a controversy as to the validity of a law apportioning the state into senate and assembly districts was also said to be a like subject. In the opinion the scope of the court's original authority was thus spoken of: "In matters *publici juris* it would seem to embrace every matter of great public interest." In support of that numerous early cases were cited, showing the broad range of subjects as

to which such jurisdiction had been previously exercised in matters of such interest. Among such citations are: *State ex rel. Att'y Gen. v. Messmore,* 14 Wis. 115, where the controversy was over the right to a high state office; *State ex rel. Att'y Gen. v. O'Neill,* 24 Wis. 149, involving the validity of a law applicable solely to the city of Milwaukee; *Slauson v. Racine,* 13 Wis. 398, involving the construction of an apportionment law; and *Att'y Gen. v. W. W. R. Co.* 36 Wis. 466, involving the validity of a legislative enactment authorizing the discontinuance for a railway of a route fixed by a law of Congress, the jurisdiction being grounded, in the main, upon the one fact that the matter was a subject of great public interest; *State ex rel. Bell v. Harshaw,* 76 Wis. 230, 45 N. W. 308; *State ex rel. Anderson v. Timme,* 70 Wis. 627, 36 N. W. 325; *State ex rel. Abbot v. McFetridge,* 64 Wis. 130, 24 N. W. 140, and *State ex rel. Anderson v. Timme,* 60 Wis. 344, 18 N. W. 837, and other cases, all indicating that the actions of state officers in matters of an administrative character are subject to the direct judicial control of this court, both as to the prevention and the redress of violations of official duty. The rule in the latter class of cases in *In re Court of Honor, supra,* and *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 88 N. W. 596, 90 N. W. 1067, is restricted to cases where the primary right sought to be vindicated is public. The primary right in this instance is that of a political party by law constituted a state agency, as we have seen, for certain purposes of a most important character. In a certain sense party action, within the legislative regulation, is state action. A function of the state in the exercise of its sovereign authority to regulate elections, by the legislative plan involved is, in part, exercisable through political party machinery. So a correct administration of such plan necessarily concerns the well being of the people as a whole.

If the issues made by the pleadings and proceedings present judicial questions, it is no less clear that the case is one

where this court should exercise its jurisdiction so far as nec-
essary to determine whether the facts stated in the complaint
and the admitted facts are sufficient to constitute a ground
for relief in relators' behalf, and in that event proceed· to a
finality in that regard, than it is that such original jurisdic-
tion is plain.    As before indicated, the public interest in the
matter is most intense.    The public rights involved are im-
portant in the highest degree.    No case has arisen in recent
years that more closely concerned all the people than this one.
Nothing short of a decision by the highest authority in our
judicial system would be at all satisfactory or adequate to
meet the situation.    The time afforded for such supreme au-
thority to speak is far too short for it to do so effectively, as·
regards the present emergency, unless this tribunal will open
its doors as a court of first instance for the purposes thereof.
True, as stated by counsel, upon the outcome of this litigation
may, within reasonable probabilities, depend the policy that
shall prevail in the administration of the state government for
a long period of time.    True, the right of the matter in con-
troversy and its speedy vindication may, within reasonable
probabilities, be vital in the determination, not only of the·
future state but the future national policy, in both of which
all the people of the state are, in the ·nature of things, most
deeply interested.    True, the result may be so far reaching
that no one would venture to mark its uttermost limits.    These
considerations not only amply justify but demand of this
court that it shall rest from the performance of its ordinary
duties a· sufficient length of time to enable it to perform its·
high function of acting directly, speedily, and efficiently to·
declare the law, so far as it is in the court's keeping to do so,
in respect to the matters alleged, rather than that the great
interests involved shall be permitted to suffer by delay.    *In re
Court of Honor,* 109 Wis. 625, 85 N. W. 497.

No other questions than those already discussed go, strictly
speaking, to the jurisdiction of the court.    The others relate

to whether the issues presented for consideration be proper for judicial cognizance, in any event, and if they be, whether the facts alleged constitute a cause of action in equity in favor of the plaintiff. Such questions, especially the latter, are often spoken of in equitable actions as jurisdictional matters. In such circumstances, however, judicial power is not involved in doubt, but whether its exercise is permissible in view of the established practice, is in doubt. *Harrigan v. Gilchrist,* 121 Wis. 127, 99 N. W. 909. The erroneous exercise of power is often denominated jurisdictional error and is such within the broad meaning of the term. That is upon the theory that where the court ought not to act at all, or to act in the particular way its jurisdiction is moved, though if it were to proceed it would not be guilty of usurpation, its judgment being binding until reversed by some proper proceedings, it should regard action as outside its jurisdiction. Evidently defendant's counsel by their motion to dismiss challenge the jurisdiction of this court within the broad meaning of the term suggested, and the cause will be considered accordingly.

It must be conceded that by the general rule there is no legal effective remedy to prevent the alleged threatened wrongful act or to redress it, if commission thereof were permitted. The remedy by *mandamus* is not available, generally speaking, in advance of some actual default in respect to a clear official duty. *State ex rel. Board of Education v. Hunter,* 111 Wis. 582, 87 N. W. 485. If special circumstances may create an exception to that rule, as suggested in the case cited, whether this case would fall within such exception is sufficiently involved in doubt to warrant a court of equity in opening its doors so far as it can afford a remedy, if the commission of a great wrong is in fact impending as alleged. It seems quite plain, since the defendant cannot, by any action on the part of the relators, be put in default in respect to the matter until a few days before the official ballot must be pre-

pared for use at the coming general election, and he may, if he sees fit, wait until fourteen days prior to that time before certifying the names of the nominees to the county clerks, that the time to elapse thereafter, before the official ballot must be ready for use, is too brief to enable aggrieved parties to use effectively their remedy by *mandamus,* or any other legal remedy. It is quite as doubtful whether equity could properly furnish a remedy for the asserted wrong if the duty of the defendant be purely ministerial, and dependent upon the decision of a *quasi*-judicial tribunal, as is claimed upon the side of the defense (*Wood v. Chamber of Commerce,* 119 Wis. 367, 96 N. W. 835); but that his conduct is subject to judicial control as to all jurisdictional questions cannot well be doubted. Whether the conduct of the defendant be so dependent is one of the questions here presented for decision. And another is whether the tribunal that assumed jurisdiction to pass upon the factional dispute committed any jurisdictional error in so doing. Each of those propositions involves several others and all are of a judicial character.

So, as we have seen, this is a proper case for the exercise of the original jurisdiction of this court in any aspect the same may be viewed. Therefore the court has assumed such jurisdiction for these purposes: To determine whether, upon the facts appearing, plaintiff has any ground for relief; to determine all of the minor questions necessarily involved in the one ultimately to be solved; and if the latter shall be determined in favor of the plaintiff, to decide upon the measure and form of relief that should go against the defendant, and to render the proper decree and to enforce it.

The time has long since passed for serious controversy as to whether in this class of cases judicial questions are involved. The idea urged upon our attention by defendant's counsel that they involve only political questions, which should be left for solution to the party organizations directly inter-

ested, has been judicially denied over and over again. We-
venture to say that there is no conflict at this time in respect
to the matter, in judicial authorities dealing with legislative-
plans for the use of an official ballot. As said in a very able
opinion recently rendered by the supreme court of South Da-
kota, *State ex rel. Howells v. Metcalf*, 100 N. W. 923:

"When the legislature in its wisdom sees fit to regulate
nominations and the printing of ballots by statutory enact-
ment, the duty of interpreting such enactments devolves upon
the courts, and they should not attempt to escape responsi-
bility, or avoid disagreeable consequences by assuming that
no judicial questions are involved. The auditor's duty and
the candidate's right respecting the preparation of the official
ballot, having been determined by statute, . . . the per-
formance of such duty and the protection of such right no-
longer present merely political questions, but must be dealt
with as other legal duties and other legal rights."

The law making political parties state agencies, as before-
indicated, in the selection of persons for public offices, shap-
ing the policy that shall be their guide in the performance of
their official duties, and regulating the manner in which such
parties shall execute their functions, created new rights and
privileges to be conserved by old or new remedies, or in part
by one and in part by the other, according as the legislative-
will is expressed in terms or by necessary implication. Every
law conferring a new privilege or right, or providing a new
and legitimate condition for the enjoyment of an old one, nec-
essarily gives rise to new possible wrongs in respect thereto,.
with a corresponding necessity for the use of remedies for pre-
vention and redress. To the maxim there is no wrong, aside-
from purely moral transgressions, without a judicial remedy
of some sort to prevent or redress the same, there is no excep-
tion, though such remedy, especially as to violations of mere
legislative privileges, or administrative regulations, as we-
shall hereafter see, is often limited to the correction of juris--

State ex rel. Cook v. Houser, 122 Wis. 534.

dictional errors of tribunals specially empowered to exercise original authority to determine the facts and apply the law thereto.

So it follows that the legislative enactment specializing as to what political parties may have the use of the official ballot and the conditions to be observed to secure the enjoyment of that privilege, impliedly renders all controversies between rival claimants to such privilege as to any particular political organization; judicial in character so far as necessary to a decision upon the ultimate point involved. The precise extent to which judicial inquiry may legitimately go, under any circumstances, need not be considered here. The cases where that has been treated in recent years are very numerous. Many of them will be found referred to in this opinion. The most recent and one of the most instructive thereof is the one to which we have referred, decided by the supreme court of South Dakota after this cause was submitted to the court. It is sufficient for this instance, that the question of whether a tribunal has been created by the legislature to determine, in the circumstances presented to the defendant, as alleged, the matter of fact as to which of the two rival claimants is entitled to the use of a particular party name upon the official ballot, and if there be such tribunal the question of whether its jurisdiction as to the facts is exclusive, except as regards jurisdictional errors, are obviously, in view of what has been said, judicial questions. If such a tribunal has been created with exclusive jurisdiction as to the facts, within the limitation suggested, and this court for that reason refuses to invade it, it by no means follows that it does not possess jurisdiction to judicially declare which of the two sets of claimants of the privilege of appearing on the official ballot at the coming general election as the regular nominees of the Republican party is entitled to such privilege. This court, for the reasons before stated, decides that it does possess that jurisdiction and that it ought to and will exercise it.

State ex rel. Cook v. Houser, 122 Wis. 534.

In the logical consideration of the case we must now examine the statute, sec. 35, Stats. 1898. That, admittedly, governs the conduct of the defendant respecting the controversy between the two contending factions. If the views thereof entertained by defendant's counsel be correct, all questions as to whether the convention which nominated Robert M. La Follette and his associates was composed of a majority of the delegates qualified to participate in the nomination of regular Republican candidates for state offices to be placed upon the official ballot for the coming general election, must be decided with reference to the determination thereof by the special legislative tribunal, except as regards jurisdictional errors committed by it, if any there be.

As we understand the matter, it was frankly admitted on the argument by the eminent counsel for plaintiff that the legislature possessed authority to create a tribunal to decide controversies arising between rival claimants to the right to appear upon the official ballot under a particular party designation, and that if such tribunal exists for the purposes of the controversy in question, its decision, within its jurisdiction, must be deemed conclusive. Whether we are right or not as to such concession, such is doubtless the law.

Whatever privileges are within the power of the legislature to grant, may be granted upon such conditions and subject to such regulations as it in its wisdom may see fit to impose. That is elementary. In dealing with this subject care should be exercised to distinguish between common-law rights, which are within the protection of constitutional restraints upon legislative authority, and mere legislative creations. A failure in that regard would be quite likely to lead one astray. The right to vote and to secrecy in respect to the elector's opinion thus expressed cannot be impaired, but the enjoyment of those rights which are within constitutional protection may have every legislative aid which the wisdom of the lawmaking power may see fit to afford. The power of regulation to that

end is limited only by what is reasonable. Any attempt to regulate passing that barrier, is destructive of the right involved, not an aid to its enjoyment, and hence is not legitimate.

In respect to the general features of our present ballot law and legislative power in respect to such matters, the court said in *State ex rel. Runge v. Anderson,* 100 Wis. 523, 76 N. W. 482:

"Without wise and careful legislative regulations, supplementing the constitutional guaranty, the elective franchise might be so abused and the means of such corruption as not only to nullify its controlling purpose, but every purpose of popular constitutional government. That extremists may carry such regulations too far is by no means improbable, but when they do it will be met by that other safeguard, the court, without which constitutional guaranties might be easily evaded and rendered useless by the ingenuity of legislatures.

"We are unable to see anything in the present ballot law which passes beyond the bounds of reasonable regulation in view of the end sought,—the right of all to vote in secrecy and upon the basis of political equality and purity."

So the plan for an official ballot, and opportunity for party representation thereon, are matters of legitimate legislative creation; hence the conditions of party representation upon such ballot are purely within legislative control. Whoever joins a political party impliedly submits to regulations in that regard, as in effect by-laws of the organization, the same as every member of any other voluntary association, upon joining the same irrevocably pledges himself to be bound by the decisions of its tribunals, save as regards jurisdictional errors. This court very recently dealt with such relations in *Bartlett v. L. Bartlett & Son Co.* 116 Wis. 450, 93 N. W. 473, and *Wood v. Chamber of Commerce,* 119 Wis. 367, 96 N. W. 835.

Errors of judgment committed by such a tribunal however numerous or serious, even though by reason thereof justice, except as regards mere form, be denied and wrong from an

State ex rel. Cook v. Houser, 122 Wis. 534.

original standpoint be made to bear the stamp of right, does not militate at all against the binding effect of the result. All must bow to it as the right of the matter from a legal standpoint, however much from a moral aspect it may appear to be wrong. That applies to all tribunals of voluntary organizations and to all special tribunals created by law to deal with legislative rights and privileges. There are so many illustrations of approved legislation as regards the latter that it is strange that a layman, even, should marvel at the existence of such laws, and passing strange that others should. There are hundreds of such tribunals. Every board of review, every one of the numerous official boards and councils empowered to act judicially is such a one. Who would expect to avoid the decision of a board of review, or the board of law examiners, or the board of control, or the board of regents, or the board of dental examiners, as to any matter within its jurisdiction, except for errors of a jurisdictional character? The books are full of decisions in harmony with what is here suggested. The following are examples: *State ex rel. Coffey v. Chittenden,* 112 Wis. 569, 88 N. W. 587; *State ex rel. Vilas v. Wharton,* 117 Wis. 558, 94 N. W. 359; *State ex rel. Augusta v. Losby,* 115 Wis. 57, 90 N. W. 188; *State ex rel. Heller v. Lawler,* 103 Wis. 460, 79 N. W. 777; *State ex rel. N. C. Foster Lumber Co. v. Williams,* 123 Wis. 61, 100 N. W. 1048, and *State ex rel. Gray v. Common Council,* 104 Wis. 622, 80 N. W. 942.

From the foregoing it is plain that whether the merits of the controversy between the two claimants of the right to a place on the official ballot as the Republican nominees, as to the facts, is within the special jurisdiction of a tribunal created by sec. 35, aforesaid, is of controlling importance in reaching a correct conclusion.

Those parts of sec. 35 which must be examined consist of the following two clauses:

1. "In case of a division in any political party, and a claim by two or more factions thereof to the same party name, the officer with whom the certificates of nomination are required to be filed shall, in certifying such nominations or preparing ballots, give preference of name to the convention or caucus thereof held pursuant to the call of the regularly constituted party authorities, and if the committee representing the other faction present no other party name, such officer may designate the same in such manner as will best distinguish the nominations thereof." '

2. "When two or more conventions or caucuses shall be held and the nominations thereof certified, each claiming to be the regular convention or caucus of the same political party, preference in designation shall be given to the nominations of *the one certified by the committee which had been officially certified to be authorized to represent the party.*"

The calls of the first clause are: First, a division in a political party. Second, a claim by two or more of the factions to the use of the same party name, and by certificates of nomination duly filed. The calls of the second clause are: First, two or more conventions or caucuses held for the same purpose. Second, nominations made by each such convention or caucus. Third, the due certification of all the nominations. Fourth, the claim by each such convention or caucus to be the regular convention or caucus of the same political party.

It will be observed at the first view of the quoted section that the element significantly present in the second clause and absent in the first, is the claim of each of the state conventions *"to be the regular convention . . . of the same political party."* The allegations of the complaint satisfy the calls of the first clause as regards mere party division and the claim by each faction to the use of the same party name, but the distinguishing element mentioned, the claim by each of the conventions *"to be the regular convention of the same political party,"* not seen in the first clause, is most significantly present in the case before us and is fully and unmistakably covered by these words of the second clause: *"When two or*

*more conventions . . . shall be held . . . each claim-
ing to be the regular convention of the same political party."*
We could but marvel when this case was presented at the bar
how the plain language of the second clause could be viewed
as susceptible of being so bent out of its literal sense as to ex-
clude the situation in hand, when all the facts thereof are so
plainly covered thereby, and the plain language of the first
clause likewise be so bent as to include such situation when
the significant element of double claim to convention regular-
ity is not suggested therein. Later, when judicial differences
arose in respect to the matter, the facility with which differ-
ent minds can read different meanings out of plain English
words, was most aptly illustrated, and one's conviction that
but a single meaning can be reasonably gathered from the lan-
guage under consideration would have been somewhat shaken,
by an impressive attempt to answer this apparently self-evi-
dent proposition: The dominant feature of the first clause of
sec. 35 is the existence of multifarious *"claims to the same
party name,"* the right of the matter being determinable by
the certifying officer by the *"call of the regular party authori-
ties"* required to appear of record with such officer by sec. 31
of the statutes; while the dominant feature of the second
clause is the existence of multifarious *"claims to the same
party name"* based on like claims *"to be the regular conven-
tion of the same political party,"* creating a controversy call-
ing for evidence *aliunde* the record.

Looking at sec. 35 from any reasonable standpoint and the
foregoing proposition seems unanswered and unanswerable.
The facts of this case respond to every call of the second clause
of the section. The first clause cannot cover a case of a double
claim to the same thing based on the conflicting actions of two
conventions, each assuming to be the regular convention of
the same political party. First, because no such double
claim is mentioned therein, and second, because it contem-
plates only conflicting claims, easily answered by the certify-

ing officer by reference to his own records, which is highly inconsistent with the idea that a double claim of regularity referable to a single and regular party call, as in this case, could fall under such clause. It is quite clear that the second clause does cover such double claim, first, because the words thereof in plain English so indicate; second, because the records in the office of the certifying officer and the nomination certificates would not furnish necessarily a certain guide for determining the dispute; and third, because *that fact is therein recognized by the creation of a tribunal to solve the uncertainty.*

The learned counsel for plaintiff, though freely confessing that at first sec. 35 impressed them as it does us, stated that by carefully scrutinizing the same they were able, or that some of them were, to discover a different meaning, which is urged with counsel's customary ability upon this court. We have carefully considered the reasoning indulged in to support such meaning, but must confess that it fails to impress us. Doubtless, the course of reasoning adopted by counsel is as convincing in support of their theory as any which the nature of the case is susceptible of. We shall not follow it in all its details, but will consider the principal features thereof.

It is suggested that the test of regularity under the first clause of sec. 35 is not the source of the call, in response to which either of the conventions was held; that there may be two conventions, each referable to the regular party authority, the nominations made by each duly certified to the proper officers, each claim the right to go upon the official ballot under the regular party designation, and all the circumstances satisfy the essentials of such clause. In that it seems not to be given due weight that, by the plain words of such clause, the certifying officer in every case thereunder must be guided by the "call of the regularly constituted party authorities," referring, clearly, to the party authority provided for in sec. 31, which requires a record to exist in his office of the names of

those entitled to exercise such authority, and further, that a double claim merely to the exclusive right to go upon the official ballot under the regular party designation is not the essential condition found in the second clause, distinguishing it from the first. It is the fact of each convention *"claiming to be the regular convention of the same political party."*

With confidence counsel suggest, "If a convention called by one committee, and that the regular committee, splits into two conventions, each making and certifying nominations, each electing and certifying a committee to represent the party, and each claiming the right to the party designation on the ballot, are not there presented the precise conditions contemplated by the first clause?" Most assuredly not, because it clearly provides for a case of one convention, held pursuant to the call of the regularly constituted party authorities, and one or more not so held.

Again counsel suggest, "It is the condition which gives the secretary of state jurisdiction" to decide a factional dispute as to the rightful claimant of a particular party designation. True, and the vital condition is one where there is no discretion to be exercised by the certifying officer in deciding as to multifarious claims to regularity referable to *"the regularly constituted party authorities."*

Again counsel say, "The calls of the first clause are: first, a division in a political party into factions; second, the claim by each to the 'same party name;' third, the holding by each of a convention or caucus; fourth, the making by each convention or caucus of nominations; fifth, the certification and filing of such nominations with the officer designated by law for that purpose; sixth, the election and certification by each with the nomination papers of a committee authorized to represent the party. All these conditions exist, or will exist, in this case." Why the learned counsel should stop there instead of naming that other condition existing here, viz.: multifarious claims to be *"the regular convention of the same political*

party," which is not solvable by the *"call of the regular party authorities,"* and so cannot fall within the scope of the first clause but is covered by the second, is not readily perceived.

The further point is made that the factional dispute in controversy in this case falls under such first clause because it was plainly the legislative purpose to give each organized faction of a party, holding a convention and certifying its nominations, as provided by law, representation upon the official ballot, and the only provision therefor is in the first clause and is contained in these words "and if the committee representing the other faction present no other name such officer may designate the same in such manner as will best distinguish the nominations thereof." That the legislative purpose is clear, as claimed by counsel, may be conceded, but the idea that it is only satisfied by the first clause is clearly wrong. It is as definitely voiced in the second clause as in the first. There can be no mistaking the meaning of these words: "Preference in designation shall be given to the nominations of the one certified by the committee which had been officially certified to be authorized to represent the party." The words "preference in designation" suggest at once and unmistakably two or more designations, one for the party ticket which is regular, and one for each of those which are irregular.

Further, our attention is called to the circumstance that the word "factions" nowhere occurs in the law, except in the first clause thereof, and it is suggested that as there is a factional dispute in the case in hand, the situation is necessarily governed by such clause. That idea seems to have had weight in creating the difference here. Why such weight, is buried in obscurity. It would seem that if any particular significance were to be given to the presence of the word "factions" in one clause and the absence of it in the other, it would point to a far different conclusion than the one contended for. Such word as regards political bodies, strictly speaking, suggests a division of the members thereof, and a separate organization

of the parts, not a mere division of a regularly called convention into two camps, the body of the party not necessarily being divided. "A faction is a party in political society, combined or acting in union, usually applied to a minority, but may be applied to a majority." Webster's Dictionary. It is "a number of persons combined for a common purpose, usually a party within a party." Standard Dictionary. It is "a party of persons having a common end in view, usually such a party seeking to bring about changes in any association of which they form a part." Century Dictionary. Each of these lexiconic meanings implies more clearly a division of the members of a party, each part striving to shape the policy, in whole or in part, of the entire body, than the mere division of a convention. The significant words of the first clause are "a division in any political party" not the word "factions." There was no division in the Republican party, strictly speaking, in this case. There was a division in the convention of such party. Probably within the broad meaning of the term "faction" a division of the members of a political party, or of its duly elected representatives, is factional, and a claim by each of two or more conventions "to be the regular convention of the same political party" would be impossible without a factional division of some sort. However, it cannot well be claimed that the term "division" necessarily includes the circumstances in question and restricts them to the first clause of sec. 35, nothwithstanding the added feature so plainly satisfying the second clause and inconsistent with the first. In our judgment the fact that the word "factions" is used in one place and not in the other has no particular significance. It merely refers to a conflict within a party, which must exist to satisfy the calls of either clause. The distinguishing feature between the two clauses is not in that the division is factional in one case and not in the other, but in the circumstances characterizing the double claim to the exclusive use of the same party name, the one calling for the

exercise of mere ministerial functions to determine the right of the matter, and the other requiring the exercise of judicial or *quasi*-judicial functions to determine the same.

We will not follow the reasoning of counsel for plaintiff further in their construction, so called, of the law in question; the most salient features thereof we have given attention to. To our minds the fundamental infirmity in such reasoning is in the assumption that there is ambiguity when there is none in fact. Of course it will not do to use rules for judicial construction to create ambiguity, or to apply such rules for the purpose of reading, so to speak, a meaning out of words other than that which the plain ordinary sense thereof points to unless the result of applying such meaning to the subject dealt with and the nature of the result is such as to suggest pretty clearly an ambiguity, which is not the case here. There is no exception to Vattel's rule of interpretation (Law of Nations, bk. 2, § 263). By slight re-phrasing thereof, without at all sacrificing the sense, it fits the situation before us.

'It is not allowable to interpret what has no need of interpretation. When the meaning is evident and leads to no absurd conclusions there can be no reason for refusing to admit the meaning which the words naturally represent. To go elsewhere in search of conjecture, in order to restrain or extend the act, would be an attempt to elude it. Such a method if once admitted would be exceedingly dangerous, for there would be no law, however definite and precise, which might not by interpretation be rendered useless.' *Absoluta sententia expositore non eget.*

That is an old and one of the most valuable maxims of the law. It sets the mark to be observed in determining when and when not to look for the sense in which words were used by the lawmaking power by the light of judicial rules. The efforts to keep such rule constantly in view in the performance of judicial labor is indicated by frequent reference thereto in decisions. *Mundt v. S. & F. du L. R. Co.* 31 Wis. 451; *Gilbert v. Dutruit;* 91 Wis. 661, 65 N. W. 511; *State ex rel.*

*Heiden v. Ryan,* 99 Wis. 123, 74 N. W. 544; *Rossmiller v. State,* 114 Wis. 169, 89 N. W. 839. In the first case cited Dixon, Chief Justice, speaking for the court, said:

"The office of interpretation is to bring out the sense where the words used are in some manner doubtful, and where these are plain and unambiguous the court cannot depart from the language of the statute. It is only where the intention of the legislature is ambiguously expressed, so as to be fairly capable of two or more meanings, that interpretation or any latitude of construction is allowable."

So it is seen that judicial construction can never legitimately commence until certainty as to what is the sense intended is found to be so obscure that it might reasonably be said to be one thing or another, either being within the fair scope of the words used to express the purpose. With that guide in view and having in mind that other well-known rule, that the literal meaning of words is always to be presumed to be the one in which they were used in legislative enactment, unless reasonable doubt arises from an examination of the whole act, or from some unreasonable or absurd result such meaning might lead to, we find ourselves unable to take the first step in the direction of a departure from the plain language of the act before us. The words *"when two conventions . . . shall be held and the nominations thereof certified, each claiming to be the regular convention . . . of the same political party"* are about as plain as English words could well be. So we cannot escape from the conclusion that the legislature created a tribunal to determine just such controversies as the one which arose by the circumstances alleged in this case, and that such tribunal for the controversy so created was the Republican state central committee appointed by the convention of that party in 1902, and certified to the secretary of state under sec. 31, Stats. 1898, the one alleged and admitted to have assumed jurisdiction over such controversy.

That there is no relief from the decision of such a tribunal

as the one in question, so long as it acts within its jurisdiction, is too elementary to warrant arguing the matter at any great length.   It is not essential that the law should so declare in order to have that effect.   The necessary consequence of creating a new right coupled with a new remedy to conserve it and to be administered in a new forum, is to make . such forum and remedy exclusive.   That such is the uniform rule is sufficiently evident in the cases already referred to. Our attention is called to several similar laws, where it is expressly declared that the decision of the special tribunal shall be final, but counsel fail to cite an instance, and we venture to say that none exists, where any court of last resort has held that such language is necessary in order that the law shall have that effect.   In the cases cited nowhere is such effect grounded on any express declaration in that regard.   All are to the effect that however wrong the decision may be from the standpoint of truth in the abstract, in the eye of the law it is the indisputable right of the matter and must be submitted to accordingly, except as to jurisdictional defects.   This court has no more right to impeach such decision than the most inferior judicial or *quasi*-judicial body has to impeach its decree.   Neither has it any authority to prevent such tribunal from acting because it is a prejudiced body and if permitted to exercise its jurisdiction it would probably decide wrong. *Wood v. Chamber of Commerce,* 119 Wis, 367, 96 N. W. 835. It is as supreme within its sphere as this court or any court.

The following cases cited in the briefs of counsel amply support the foregoing: *Miller v. Clark,* 62 Kan. 278, 62 Pac. 664; *Chapman v. Miller,* 52 Ohio St. 166, 39 N. E. 24; *Randall v. State,* 64 Ohio St. 66, 59 N. E. 742; *People ex rel. Ward v. Roosevelt,* 151 N. Y. 369, 45 N. E. 840; *People ex rel. Lowry v. District Court* (Colo.) 74 Pac. 896; *State ex rel. Brewer v. Abbay,* 82 Miss. 559, 35 South. 153; *State ex rel. Yates v. Crittenden,* 164 Mo. 237, 64 S. W. 162.   In *State ex rel. Brewer v. Abbay,* the court said:

"In case of a primary election there is no tribunal vested with power to determine who is the party nominee, to correct the wrongs and frauds bearing upon the solution of that question,—save only the executive committee of the county."

In a concurring opinion in *State ex rel. Yates v. Crittenden* this language was used as a guide in determining the right of matters respecting factional disputes similar to the one in question:

"The statute provides the test by which the right must be determined by the clerk or the court, if the court is called upon to act in the premises. It reads 'the action of the preceding regular convention of such party regularly called shall determine the action of the secretary of state, the county clerk, or the court in its decision.' "

In *People ex rel. Lowry v. District Court,* this language was used:

"That the state central committee of a political party, or the state convention, as the case may be, is now the sole tribunal to determine such controversies as is here presented is to our minds clear beyond all doubt; and as a necessary consequence the courts do not have concurrent jurisdiction in the premises."

It should be observed that the conclusion as to the exclusive jurisdiction of the special tribunal was not there based on a legislative declaration that its decision should be deemed final, but on the fact that it was the necessary result of unqualified jurisdiction being conferred thereon. Again in *Miller v. Clark, supra,* it is said that:

· "It is a cardinal rule that when a right given is solely and exclusively of legislative creation, and does not derive existence from the common law, or from the rules prevailing in courts of equity, and jurisdiction is limited to particular tribunals and specific remedies are provided for its enforcement, the jurisdiction and remedy can be exercised and pursued only before the tribunals and in the mode the statute has provided."

. Here again the finality of the decision of the special tri-
bunal was not made to rest necessarily on the language of the
statute giving it that effect, but it was held that such was the
necessary result of the creation of the new right coupled with
.the new remedy to be applied by means of the new tribunal,
without any provision for review of its decision.

; The only excuse for one's feeling shocked at finding such
.a piece of legislation as the one we are dealing with upon
the statute books and to discover that its legal effect is as
indicated, is unfamiliarity with the trend of regulations that
have become common since the official ballot law system was
adopted in this country.   Many states have substantially such
a law as sec. 35.    Experience with the Australian ballot sys-
tem early demonstrated that many serious disputes were
liable to occur in its administration and of a nature which
courts had not theretofore been called upon to deal with and
which because of their political nature should, so far as prac-
ticable, be kept out of court.   Authority to decide such mat-
ters, it was appreciated, should be lodged somewhere.   The
result of experience and legislative consideration was that
here and elsewhere a tribunal was selected, which was thought
to be as likely to decide justly as any, not strictly judicial,
well knowing that its proceedings in order to meet emergen-
cies as they arose would necessarily be of a somewhat sum-
mary character and its decision only be open to judicial re-
view for errors other than those of judgment.   The legisla-
ture had a right to enact such a law if it saw fit.   It had the
right to make the use of the official ballot by political parties
subject to any condition which it deemed proper, particularly
to require that, in cases of factional disputes, they should be
settled as regards such privilege, by the party tribunal spe-
cially designated by law.   There was no constitutional limita-
upon its power in that regard, which we are aware of, and
none has been suggested.   When we observe how many tri-
bunals there are commonly dealing with valuable rights with

the same unlimited power, in their legitimate spheres, as the one in question, and that the particular class of laws of which that one is a fair type, is the result of much experience with legislative plans for an official ballot, and is gradually becoming a part of every such plan, one should hesitate before even condemning the policy thereof. It is only very recently that the state of Colorado by act of its legislature empowered the state central committee of every political party of such state to exercise the most complete and exclusive jurisdiction to settle its party disputes whether in counties, Congressional districts, or the state at large. Laws of 1901, ch. 71.

Counsel for plaintiff insist that, notwithstanding the conclusions reached, the court should disregard the special tribunal and its decision for jurisdictional error in acting at all, in that many of its members were disqualified because they were indirectly interested in the result and greatly prejudiced in the matter. Further, if that were not so, counsel contend that the tribunal did not keep within its jurisdiction, in that it disregarded the decision of the national Republican convention, which was binding on it as the highest party authority. We shall give attention to both of those propositions.

The first proposition stated is ruled against the plaintiff by *State ex rel. Starkweather v. Common Council,* 90 Wis. 612, 64 N. W. 304; *State ex rel. Getchel v. Bradish,* 95 Wis. 205, 70 N. W. 172; and *Wood v. Chamber of Commerce,* 119 Wis. 367, 96 N. W. 835. Counsel frankly confess that by the first of these cases neither interest nor bias disqualifies a member of an administrative body empowered to act judicially in regard to a privilege or right of legislative origin from performing duties of a judicial nature in respect thereto. Three members of the tribunal there were pecuniarily interested in a controversy as to the guilt of the mayor of charges filed against him, which, if sustained, warranted the council in depriving him of his office. One of the members,

at least, was actively concerned in filing such charges. Another, as appears from the record in this court, acted in the capacity of prosecuting attorney before the body, while a majority of the members were said to be, from the start, highly prejudiced against the accused. The court said that all the members were competent to participate in the trial. That doctrine was subsequently, inferentially, approved in *State ex rel. Getchel v. Bradish,* as counsel concedes, and they might further have well conceded, as the fact is, that it was again most distinctly approved in *Wood v. Chamber of Commerce.* It was there stated, generally, that prejudice on the part of a member of a *quasi*-judicial tribunal, in respect to a matter to be determined by it, does not go to his capacity to participate in the proceedings in regard thereto, or affect the decision of such tribunal. But counsel argue that the decision in the *Getchel Case* was grounded on a wrong theory, in that it went upon the idea that a vested right of property entitled to constitutional protection, the same as any common-law right, was involved, taking the case out of the rule of the *Starkweather Case;* that the logical ground for the decision to rest upon is that the participation, as a member of such a tribunal, of a person who would be disqualified as a judge, renders the decision reached by it a nullity. Our answer to that must be that it is too late to establish a new basis for that decision. Certainly there was no union of purpose here to hold, as was done, upon any other theory than the one we have suggested. Without such theory the decision would have been otherwise, following the rule in the *Starkweather Case.* It was supposed that a mere reference to that case with a suggested distinction between the two would be sufficient to indicate approval rather than any purpose to override the former ruling. We recognize the doctrine of the *Starkweather Case* to be now, after the lapse of nearly ten years and the approvals thereof indicated, firmly established. The maxim *stare decisis et non quieta movere* must

prevail against all efforts to disturb it. Can there be any doubt but that unless those decisions are to be overruled, the proposition that the tribunal in question was without juris-diction, is untenable? We understood on the argument that counsel for plaintiff, with commendable frankness, admitted that it could not.

We might forego saying anything further on the subject of whether the tribunal answering to sec. 35, for this case, was competent to act. Upon a subject where the court has repeatedly and unmistakably spoken, it is generally supposed to be sufficient upon the same subject coming again to its attention to refer to its previous decisions. However, there are special circumstances in this case that seem to warrant doing more.

We fully concede that there are decisions elsewhere out of harmony with the rule of this court, above indicated. The following are instances: *State v. Crane,* 36 N. J. Law, 394; *State ex rel. Barnard v. Board of Education,* 19 Wash. 8, 52 Pac. 317; *Leeson v. General Council,* L. R. 43 Ch. Div. 379; *Queen v. London Co. Council* (1892) 1 Q. B. 190. But why refer to those and similar cases as *controlling authorities in the instance before us* or even suggesting doubt as to whether the special tribunal in question was disqualified from acting, in the face of the obvious fact that the learned judges—who discoursed therein so eloquently, and none too much so, upon the general subject of the importance of courts of supreme control carefully guarding the fountain of justice from contaminating influences, with all of which we most heartily agree—wrongly assumed, as is apparent, that the standard for tribunals dealing with common-law rights was applicable to purely ministerial bodies acting judicially as to mere legislative privileges? Can there be any possible doubt as to the truth of the proposition, that what belongs to the people to do with as they deem best, those things respecting which their will is unrestrained by any

constitutional limitation, they can grant upon the condition, among others, that the enjoyment thereof shall be solely secured by such remedies and administered by such tribunal as they may see fit? If there is, then the scores of boards and councils and commissions which every day act judicially in respect to such matters, without a thought on the part of anybody conversant with the law that their decisions are subject to judicial review, should have immediate legislative attention. Does not every board of review pass upon, or have power to do so, the valuation for purposes of taxation of the property owned by the relatives and business associates of its members? And how about the assessor, who sits as a member of such board, though its function is to pass upon, in a judicial way, his own work? Many other illustrations quite as striking could be given, all demonstrating that the decision in the *Starkweather Case* is in perfect harmony with the existing order of things, generally, and showing that the disquisitions found in some judicial literature respecting purity of judicial methods, as to members of a tribunal such as the one in question, applying to them the test for a judge as to qualifications for the performance of his official duties, are all wrong. Such things sound well to the ear, as do all lofty sentiments regarding the preservation of spotless judicial integrity and shielding the courts even from danger of every opportunity for a well-grounded suspicion as to their decisions being influenced by ulterior matters, but when illegitimately applied to a mere ministerial officer in the performance of administrative duties, merely because he is clothed with some discretion in the matter, denominated *quasi*-judicial authority, are liable to lead to judicial error and to promote harmful impressions among the people.

We face a situation calling for approval or condemnation of a rule firmly grounded in our system, fully conscious that it is out of harmony with a few authorities, as indicated.

We cannot fail to appreciate such want of harmony, since in *Queen v. London Co. Council,* referred to in the *Getchel Case,* without its conflict with the *Starkweather Case* there clearly appearing, the very doctrine of the latter case was presented for consideration and disapproved. It was stated by Poland, Q. C., in this unmistakable language:

"It must be conceded if a similar state of facts had occurred with regard to justices sitting in court of session the proceedings would have been invalid, but the distinction in the present case is that the county council were acting in the performance of administrative not judicial duties."

We meet that situation both with the doctrine of *stare decisis* and the uniform course of approved legislation in this state.

No better illustration of the dangerous tendency above indicated can be given than by referring to *State ex rel. Barnard v. Board of Education,* 19 Wash. 8, 52 Pac. 317, where the learned court went so far as to suggest that mere prejudice was a common-law disqualification of a judge and should likewise be of a member of a *quasi*-judicial tribunal. A standard authority was criticised for expressing a contrary view. We venture to say that the text referred to, 17 Am. & Eng. Ency. of Law (2d ed.) 52, to the effect that by common-law mere prejudice does not constitute disqualification of a judge, is elementary. In *Peyton's Appeal,* 12 Kan. 407, the court said, "It will be admitted that at common law prejudice did not disqualify a judge." In *Conn v. Chadwick,* 17 Fla. 439, it is said:

"In the time of Bracton and Fleta a judge might be refused for good cause, but at common law, as administered in England and the United States for centuries, judges and justices could not be challenged. There were disqualifying causes, such as interest, and being of kin to the party."

In *Davis's Estate,* 11 Mont. 1, 27 Pac. 342, a very full discussion on the subject will be found. It is there very conclusively demonstrated that disqualification for mere preju-

dice of the tribunal or judge rests wholly on statutory regu-
lations. *Williams v. Robinson,* 6 Cush. 333, is referred to
as containing a contrary suggestion, but it is said to be wholly
without support.

But let alone every consideration above mentioned as to
why the members of the tribunal in question were not dis-
qualified and test their competency by the stern rule applied
at common law to judges, and still no disqualification will be
discovered.  Common-law disqualification only went to real
direct personal interest of some nature in the result, or kinship
to some one of the parties.  *Case v. Hoffman,* 100 Wis. 314–
356, 75 N. W. 945; *Turner v. Comm.* 2 Met. (Ky.) 619; 2
Bacon, Abr. tit. COURT; *Fowler v. Brooks,* 64 N. H. 423, 13
Atl. 417; *Moses v. Julian,* 45 N. H. 52.  Often it will be
found said to be confined to interest alone.  17 Am. & Eng.
Ency. of Law (2d ed.) 733; *Russell v. Belcher,* 76 Me. 501;
*Winchester v. Hinsdale,* 12 Conn. 88; *In re Dodge & S. Mfg.
Co.* 77 N. Y. 101.  That interest by the weight of authority re-
fers to some direct pecuniary interest.  *Hungerford v. Cush-
ing,* 2 Wis. 397; *Taylor v. Williams,* 26 Tex. 583; *Foreman
v. Hunter,* 59 Iowa, 550, 13 N. W. 659; 17 Am. & Eng.
Ency. of Law (2d ed.) 741, and cases cited.  There is no
claim here that any member of the special tribunal was of
kin to any party to the controversy or in common-law sense
interested therein.  True, the determination of such contro-
versy involved to a large degree the conduct of the members
of such tribunal and the political fortunes of their friends.
True, the situation was one well calculated to strongly in-
cline them, consciously or unconsciously, especially in case
of doubt, to one side, and also incline them to discover doubts
where otherwise none would be perceived, but that indicates
merely prejudice.  That situation was one warranting a court,
upon its jurisdiction being properly invoked therefor, to scru-
tinize closely the conduct of the tribunal.  In determining
whether its decision was characterized by error so palpable

as not to be attributable reasonably to error of judgment, it might be very persuasive but would not of itself constitute jurisdictional infirmity. In no aspect of the case that we can discover was the attitude of the committee such as to violate the salutary rule that no man can be a judge in his own case, so rigidly enforced as to courts upon common-law principles, and so generally supplemented by legislation.

But going further and conceding for the moment that the proposition last discussed could in any event be resolved in favor of the position of counsel for the plaintiff, we meet at once the stern rule of necessity, which puts aside all the grounds for judicial disqualification, when otherwise there would be no tribunal whatever to administer any remedy for the grievance waiting for redress. The courts, in treating that rule, will be found generally to have restricted it to the precise case in hand and yet viewed it broadly enough to fully suffice therefor. Its application to this case can readly be seen since the committee had sole authority to decide the factional dispute, and yet according to the allegations of the complaint, a large majority of its members were highly prejudiced against the relators. This court has recognized the rule of necessity, where otherwise the one empowered to apply his judgment to the matter would have been disqualified, in *Jefferson Co. v. Milwaukee Co.* 20 Wis. 139. The same rule justified Chancellor KENT in *Stuart v. Mechancis' & F. Bank,* 19 Johns. 496, to keep his place upon the bench though pecuniarily interested in the trial before him. In *In re Leefe,* 2 Barb. Ch. 39, Chancellor WALWORTH deemed himself justified by it in presiding, though one of his relatives was a party, and by express statutory provision he was disqualified. In *Mooers v. White,* 6 Johns. Ch. 360, Chancellor KENT again leaned on that rule in presiding, though by the literal sense of the statute disqualified, as in the case aforesaid. In the Yr. Book 8 Hen. VI, 19, 2 Roll. Abr. 93, the judges who presided relied upon the same rule

in performing their duties, though all were defendants in the action. That is referred to as a very apt illustration of the extent to which the rule has been applied in *Mayor v. Markwick*, 11 Mod. 164. Further to the same effect are: *In re Ryers*, 72 N. Y. 1; *Thellusson v. Rendlesham*, 7 H. L. Cas. 428; *Comm. v. McLane*, 4 Gray, 427; *Ten Eick v. Simpson*, 11 Paige, 177–179; *People ex rel. Morris v. Edmonds*, 15 Barb. 529–531. It should be noted that in the authorities, to which plaintiff's counsel can best turn to sustain their contention on this, the rule we are discussing is fully recognized. *Stockwell v. White Lake*, 22 Mich. 341; *State v. Crane*, 36 N. J. Law, 394; and *State ex rel. Barnard v. Board of Education*, 19 Wash. 8, 52 Pac. 317.

In addition to the foregoing on the same subject the following are peculiarly in point: *People ex rel. Burby v. Common Council*, 85 Hun, 601, 33 N. Y. Supp. 165; *People ex rel. Doherty v. Comm'rs*, 84 Hun, 64, 32 N. Y. Supp. 18; *People ex rel. Pond v. Trustees*, 4 App. Div. 399, 39 N. Y. Supp. 607; *People ex rel. Shannon v. Magee*, 55 App. Div. 195, 66 N. Y. Supp. 849; *People ex rel. Jones v. Sherman,* 66 App. Div. 231, 72 N. Y. Supp. 718, affirmed 171 N. Y. 684, 64 N. E. 1124; *People ex rel. Miller v. Elmendorf,* 51 App. Div. 173, 64 N. Y. Supp. 775. In *People ex rel. Shannon v. Magee,* the officer acting judicially was also in ,a sense the prosecutor as well. The principle of the decision is well stated in the syllabus thus:

"Where by statute a police commissioner is made the only tribunal authorized to try charges against a janitor of the police station, his jurisdiction is not affected by the fact that he is prejudiced against the janitor."

In *People ex rel. Burby v. Common Council*, there was a trial, so called, before the common council, quite similar to that in the *Starkweather Case.* The point was made that certain members of the body were disqualified to act, testing their

competency by the rules as to judges and jurors.    The result
is stated in the syllabus, thus:

"If the common council of a city is made by statute the
only tribunal that can take certain proceedings against an
officer of such city, the duty that devolves upon each member
of the common council to take part in such proceedings is
absolute, notwithstanding the fact that such member thereof
may have formed such opinion, or taken such action in the
premises, as would disqualify himself if he were a judge or
juror in an action at law."

We note that it is said in *State ex rel. Barnard v. Board
of Education,* 19 Wash. 8, 52 Pac. 317, that this was over-
ruled in *People ex rel. Pond v. Trustees,* 39 N. Y. Supp. 607.
Not so, however, in any sense, as regards the competency of
a member of such tribunal as that referred to, to take part in
a trial before it so far as necessary to enable it to perform its
function in that regard.    The case was referred to as author-
ity, without any qualification, in subsequent decisions cited.

From the foregoing it will be seen that, viewing the situa-
tion of the members of the committee satisfying the call of
sec. 35, as to the controversy in question, the claim that they
had no jurisdiction to act because disqualified by common-
law rules as to judicial officers, has no support.  But we choose
to rest the competency of the members of such committee on
the broad doctrine of *State ex rel. Starkweather v. Common
Council,* 90 Wis. 612, 64 N. W. 304.    It was a mere admin-
istrative body, not a court in any sense, nor were its members
expected to exercise the functions of judges, strictly speaking.
The matter to be dealt with was a mere legislative privilege,
grantable upon any condition the legislature saw fit to impose.
The tribunal was given unqualified authority in respect
thereto, so long as it proceeded within its appropriate sphere.
None of the rules disqualifying judges or jurors have any ap-
plication to such a situation.

The proposition that the special tribunal under sec. 35 has

no jurisdiction, in any event, other than to endorse the decision of the national Republican convention, is urged upon our attention with an earnestness and confidence, and an array of authorities, indicating quite clearly that it is the main reliance of the plaintiff. At this stage of the study of the case we are strongly impressed with the idea that behind the screen created by an imposing array of detail facts as to the make-up of the two conventions lies the main contention upon the side of the plaintiff, while behind a similar screen lies the main contention of the defendant. Neither expects this court to go into the *minutiæ* of the matters evidentiary, as to which of the two conventions was composed of a majority of those responding to the call of the state central committee, and entitled to participate in the execution of the functions of such call. It seems to be agreed that such party disputes as those underlying the ultimate question of fact, as to which of the two conventions was regular, should be settled by the highest party authority, in harmony with the elementary rule that all voluntary organizations are to be governed in their internal affairs by their own tribunals. The real difference between counsel for the respective parties seems to be as to what, under the circumstances, stands for the highest party authority. On the part of the plaintiff it is contended that the national Republican convention answers to such call. On the part of the defendant it is contended that "the state central committee of the party that had been officially certified to the office of the secretary of state" necessarily answers thereto, since such in effect is the legislative mandate. We think this case, in the main, comes down to that. While counsel for plaintiff, as well as counsel for defendant, plead numerous circumstances evidentiary as to whether the convention which nominated the relators was composed of a majority of the delegates entitled to seats in one duly held pursuant to the regular party call; they have the appearance of being largely matters of inducement leading up to the claims principally, as indicated, viz.: on the

side of the plaintiff, that the doors of judicial and other tribunals were closed to the consideration of such evidentiary matters by the decision of the highest party authority, the national Republican convention; on the side of the defendant, that such doors were so closed by the decision of the party authority made the highest by law, the state central *"committee that had been officially certified to be authorized to represent the party."*

The briefs on both sides, particularly upon the side of the plaintiff, are replete with erudite judicial utterances indorsing judicial submission to the decision of political tribunals as to political party disputes, such submission as a mere matter of judicial policy, or in conformity with elementary principles as to the judicial treatment of tribunals of voluntary organizations, or by command, express or implied, of legislative power. The following illustrations of judicial wisdom, quoted by the learned counsel for the plaintiff, are quite as applicable to the side of the defendant as to that of the plaintiff, when it is appreciated that the tribunal created by sec. 35, by the will of the legislature of this state, answers fully to the call for the highest party authority.

EDWARDS, J., in discoursing on the appropriate relation of courts to political controversies, in *In re Fairchild,* 151 N. Y. 359, 45 N. E. 943:

"It is much more proper that questions which relate to the regularity of conventions, to the nomination of candidates, and the constitution of committees should be determined by the regularly constituted party authorities, than to have every question relating to a caucus, convention, or nomination determined by the courts, and thus, in effect, compel them to make party nominations and regulate the details of party procedure instead of having them controlled by party authorities. We think that in cases where questions of procedure in conventions or the regularity of committees are involved, which are not regulated by law, but by party usages and customs, the officer called upon to determine such questions should follow the decision of the regularly constituted

authorities of the party, and courts in reviewing the deter-
mination of such officers should in no way interfere with such
determination. We think an opposite rule would be in con-
flict with the spirit and intent of the statute, burden the
courts with a class of litigation that would be unfortunate
and embarrassing, and might produce results entirely at vari-
ance with the will of a majority of the electors of the party."

As to the necessity of submitting to duly constituted author-
ity in political party matters, even though seemingly unjust,
such a course being absolutely essential to party integrity,
ADAMS, J., in *In re Redmond,* 25 N. Y. Supp. 381, used this
language:

"When it has once passed judgment upon conflicting
claims, where questions of regularity only are concerned,
it seems to me that its determination should be accepted as
final. Such determination may be unjust, it may be in direct
violation of the equities of the given case, and, as contended
by counsel, in theory it may be right and proper to disregard
such an adjudication. . . . But if such a theory were
put into practice it would be subversive of party discipline
and would reduce political parties to mere associations of
independent and irresponsible mobs. No such rule as the
one contended for obtains in any voluntary organization, but,
on the contrary, the very term 'organization' implies a recog-
nition of order, and an obedience to duly constituted authority.
These observations lead, of necessity, to the conclusion that
where a person allies himself with a political party he tacitly
acknowledges allegiance to all the rules and regulations of
that party, as enunciated or expressed by what party usage
recognizes as the supreme or superior authority of the organi-
zation. . . . It follows that the applicant, having re-
ceived his nomination at the hands of a convention whose
claims to regularity have been submitted to the supreme
authority within the party in the state, and which have by
that body been declared unfounded, cannot be regarded as a
regular nominee of his party, and is consequently not entitled
to have his name printed upon the official Democratic ballot."

HAZELRIGG, J., in *Cain v. Page,* 42 S. W. 336, 19 Ky. Law
Rep. 977, speaking of the decision of the state convention

recognizing a particular party committee as regular which had assumed to act under a law similar to sec. 35:

"The voice of that convention was the very voice of the Democratic party. The word of the convention is the law of the party, and the courts cannot look beyond this word or this law, because there is no other."

The same justice, in *Moody v. Trimble,* 58 S. W. 504, 22 Ky. Law Rep. 692, as to the policy, legislative or otherwise, of leaving the settlement of party disputes to party authorities, said:

"The settlement of such questions, in the nature of things, should be left to the party authority; and therefore we will not scan too closely party rules which undertake, however imperfectly, to confer authority on its various committees to manage party affairs to the best interests of the organization, nor deny such authority, even if it be conferred in terms somewhat general."

The following cases, most of which are cited by counsel, are to a similar effect:

*Prince Co. v. Linderman,* 2 Pa. Dist. 4; *Rose v. Bennett* (R. I.) 56 Atl. 185; *Ker's Nomination,* 2 Pa. Dist. 14; *State ex rel. Buttz v. Liudahl,* 11 N. Dak. 320, 91 N. W. 950; *In re Fairchild,* 151 N. Y. 359, 45 N. E. 943; *State ex rel. Yates v. Crittenden,* 164 Mo. 237, 64 S. W. 162; *State v. Martin,* 24 Mont. 403, 62 Pac. 588; *Miller v. Clark,* 62 Kan. 278, 62 Pac. 664; *State ex rel. Gilchrist v. Weston,* 27 Mont. 185, 70 Pac. 519; *People ex rel. Lowry v. District Court* (Colo.) 74 Pac. 896; *Davis v. Hambrick,* 109 Ky. 276, 58 S. W. 779; *In re Woodworth,* 16 N. Y. Supp. 147; *S. C.* 19 N. Y. Supp. 527; *Stephenson v. Election Comm'rs,* 118 Mich. 396, 76 N. W. 914; *Shields v. Jacob,* 88 Mich. 164, 50 N. W. 105; *Phelps v. Piper,* 48 Neb. 724, 67 N. W. 755; *Allen v. Glynn,* 17 Colo. 338, 29 Pac. 670; *State ex rel. Sturdevant v. Allen,* 43 Neb. 651, 62 N. W. 35.

All of those cases have been examined with care. To review them here at length would extend the discussion of this

branch of the case to an inordinate length. We shall confine ourselves largely to a statement of conclusions. While, generally speaking, they support the proposition very strongly that controversies such as we have here should, as to the evidentiary facts at least, be determined by the party tribunals, courts going no further than to keep such tribunals within their jurisdiction and to give effect to their decision within that field, as regards the state election laws, there is a wide difference of opinion as to what is the highest party authority, under a given state of circumstances, requiring judicial assistance to determine it. We do not find anything in any of such cases remotely, even, sustaining the proposition that the decision of the national convention of a party is superior to the decision of the state tribunal of the same party, where the latter tribunal is made the sole judge by legislative enactment, or otherwise. It must not be lost sight of that the only logical basis for the so-called doctrine of the supremacy of the highest party authorities as to party disputes, where there is no legislation on the subject, is the law relating to voluntary organizations generally. That was not appreciated by all of the learned men who have discussed the subject judicially. There is no difference, in the absence of legislation on the subject, between the binding effect of the highest authority in a political party than in any other voluntary organization. In some jurisdictions, losing sight of that, judges discoursed eloquently to the effect that political party disputes of the sort we are dealing with involve mere political questions. That is obviously not the fact, under the official ballot law system, as we have seen, and is demonstrated in the recent case heretofore cited. *State ex rel. Howells v. Metcalf* (S. Dak.) 100 N. W. 923. Others reasoned up to the conclusion that judicial tribunals are not the proper forums for the settlement of political party disputes, solely upon the ground of public policy, and held that in the absence of a remedy given by the statute for deciding between rival claim-

ants to the party name, the courts should not furnish one, but should allow all to go upon the official ballot and submit their controversy to a decision by the body of the party. In every instance where, by law, a special tribunal existed, as in this case, its decision was held to be the law of the party and binding on the courts. Where, prior to the existence of such a law, as in Colorado, the doctrine of the highest party authority prevailed upon the general principles respecting voluntary organizations, the state convention or the state central committee being deemed to be such authority, either from the very nature of the organization itself or because of its written laws or its usages; after there was such a law it was held that the tribunal thus created answered to the call for the highest party authority within the meaning of the previous decisions. Further, in every instance where by law it was provided in the case of rival nominations of the same political party for the same offices, all claiming to be regular, that the conflict should be settled by a particular tribunal mentioned, it was held that each such nominee, upon the instant of receiving his nomination, became possessed of a vested right to go upon the official ballot under the regular party designation subject to the performance of the legislative conditions precedent thereto, one being that in case of a dispute as to such right the decision in respect thereto should be made by such tribunal.

The following expressions in decisions treating the subject will emphaize what has been said. In *State v. Martin,* 24 Mont. 403, 62 Pac. 599, this language was used:

"Organization and discipline are necessary to party existence. There must be some authority to which the subordinate divisions may appeal for the settlement of disputes as to who shall represent the party and control its affairs. But in the settlement of these controversies this authority, established by rule or usage within the party, may not presume to disregard legislative enactments, with the enforcement of which the courts alone have to do, and take away rights which have

already become fixed. . . . To hold otherwise would be to put the convention above law, and to convert the court into an instrumentality through which, regardless of the law, penalties could be inflicted upon recalcitrant party members and disloyal candidates, to enforce party discipline."

In the state of Colorado, previous to the law of 1901, the court took jurisdiction to settle party disputes as before indicated. *Spencer v. Malony,* 28 Colo. 38, 62 Pac. 850. Thereafter, the law having made the state central committee of a party its tribunal to settle such disputes, the court said, in *People ex rel. Lowry v. District Court* (Colo.) 74 Pac. 896:

"That the state central committee of a political party, or the state convention, as the case may be, is now the sole tribunal to determine such controversies as is here presented, is to our minds clear beyond question."

Speaking of the previous case of *Twombly v. Smith,* 25 Colo. 425, 55 Pac. 254, where the doctrine of superior party authority was repudiated as regards an attempt to apply it to the settlement of a dispute in a district, by a decision of the convention for territory including such district with others, the court said:

"Had such a statute been then in force here, those cases in which is upheld the authority of the state committee of a party to settle factional disputes would have been followed."

In *State v. Martin,* 24 Mont. 403, 62 Pac. 588, the court used essentially the following language, which seems directly in point here: The right of candidates duly nominated by a political party, whose certificates of nomination have been duly filed, to have their names printed upon the ballot, can be destroyed or waived only by death or resignation, or by conviction of a felony, judicially declared insanity, or removal from the state or county. This, and this only, can deprive a candidate of the right to be placed upon the ballot.

We indorse that. We are unable to find anything in the cited cases, rightly viewed, in conflict therewith.

In view of the foregoing, since the law of this state has provided the conditions under which the party nominees shall go upon the official ballot, how can it be reasonably said that the decision of the national convention of a party can nullify it? The answer seems so plain as not to warrant this extensive treatment of the matter. Nothing but the great importance of the case could be held to justify it. The moment the conventions performed their work of choosing candidates, the rights of such candidates to have their names placed upon the official ballot became irrevocable privileges, subject only to the legislative condition. That such condition could be displaced by any mere party authority, either within or without the state, dignifying it as paramount to the sovereign will of the people, and so binding its courts and its special tribunal created to decide the matter, does not seem to us to have support in reason or authority.

It follows that the decision of the Republican national convention has no significance whatever as regards the duty of the defendant or the jurisdiction of the *"committee that had been officially certified to"* his office within the meaning of the second clause of sec. 35, viz., the state central committee of the Republican party elected at its state convention in 1902, and which acted in response to the contest in hand. No jurisdictional error was committed by such tribunal in disregarding such decision. If it had omitted to apply its judgment to the matter, in deference to such decision, jurisdictional error would have been committed thereby.

Enough has been said to demonstrate that in full harmony with the law that, within jurisdictional limits, the decision of the highest tribunal of a voluntary organization as to any of its internal controversies is binding on the courts, and in full harmony with the logically resulting doctrine that political party disputes, in the absence of legislation, should be left solely to the highest party authority, indicated by the nature of the organization itself, for settlement, or, at least,

if settlement was so made, it should be deemed binding on the court, sec. 35 and all similar laws had their origin. An examination of the authorities shows plainly that in some jurisdictions the controlling effect of party decisions has not been recognized. *In re Fairchild,* 151 N. Y. 359, 45 N. E. 943. In others where it has been recognized, one of the most difficult questions for determination was,—What constitutes the highest party authority? The answer in one jurisdiction is often found to be out of harmony with that in another. The obvious purpose of such legislation as that in question was to recognize the general principle of party government by the party itself, but at the same time to remove all opportunity for controversy, as affecting the official ballot, respecting what shall stand as the highest party authority. The case before us suggests many possible complications that might perplex the courts, without some such regulation as that in sec. 35, respecting what shall be regarded as the controlling party authority. Without it, if one of the Congressional conventions had divided, each part electing delegates to the national convention and naming electors to go on the official ballot, and the state convention, in some appropriate way, had recognized one faction and the national convention the other, judicial interference to determine which of the two conventions represented the highest authority in the matter might have been necessary as to the official ballot law, and with no certain guide to go by. With the statute all complications in such cases are avoided.

So by the law's mandate what stands for the highest authority in the matter in hand has spoken within its jurisdiction. It is not only in effect the voice of the party itself, but is the voice of the law. It must be so regarded, as to the official ballot system, in all courts and in all places. The proper tribunal having performed its function legitimately, so far as appears, it must be presumed, here and elsewhere in the administration of the law, to have reached a right result. All con-

cerned in such administration must bow thereto, as duly constituted authority must be submitted to in any other field. Guided thereby, and by the plain language of sec. 35, the defendant has a plain ministerial duty to perform. That is to certify to the various county clerks the names of the candidates decided to be the regular nominees of the Republican party, and the names of the relators as well, giving preference, however, as to the use of the name "Republican Ticket," to the former. If the committee representing the organization which nominated the relators do not present any other party name than that which the former are entitled to the exclusive use of, then by the clear mandate of such sec. 35 it is the duty of the defendant to designate such organization in such a manner as in his judgment will best distinguish the irregular from the regular nominees.

The foregoing enables us to rest from our labors without giving any consideration whatever to the facts in detail upon which the respective parties base their claims to having had the support, each, of a majority of the delegates entitled to participate in the convention regularly called. With the question of whether, as an original matter, the persons composing the convention which nominated the relators constituted a majority of the delegates duly qualified to participate in the convention called by the regular party authority and should have been permitted to organize as such, at the time and place named in the call, and whether they were wrongfully deprived of that right by the state central committee of such party and others participating in the convention which nominated Robert M. La Follette and his associates, or whether the national Republican convention decided right or wrong, for itself, in determining which of the sets of delegates applying for seats in such convention as the regular Republican delegates from this state, were entitled to be recognized as such, we have nothing whatever to do. We have ascertained that the highest party authority, as recognized by our laws, has spoken on the

subject in hand. No jurisdictional defect in that regard has been found to exist. We must accept what it has decided to be the law.

*By the Court.*—Both the motion of the plaintiff and that of the defendant are denied, and the cause is dismissed for want of sufficient facts appearing to constitute a cause of action.

The following opinion was filed October 24, 1904:

WINSLOW, J. (*concurring*). When the legislative branch of the government deemed it best to print an official ballot and interdict the use of any other, to recognize political parties as legal entities, to regulate caucuses and conventions by law, and to give rights of representation on the official ballot to the nominees of such conventions and caucuses, there was doubtless opened a new field for litigation, which is also a field of vast importance. Before the existence of these laws political parties were mere voluntary organizations with no standing before the courts. Conventions and caucuses were merely meetings of citizens, which the law permitted, but did not deign to regulate; and all questions as to party regularity were doubtless merely political questions, and were settled by one tribunal only, namely, the tribunal of the electorate. These new laws, however, created new legal rights and corresponding legal duties. They recognized the party not merely as a voluntary association of voters, but as a body exercising rights and performing duties closely akin to governmental rights and duties; a body entitled to speak for its members and have its speaking heard; a body whose acts duly and regularly performed and recorded control the acts and mark out the duty of public officers in preparing the official ballot. Thus the political party has become really a *quasi*-governmental agency. By its action, duly taken, legal rights are conferred upon its nominees and duties are imposed upon

public officers. Where rights are conferred and duties are imposed, and the claim is made by one who is entitled to be heard that the rights are denied or the duties are neglected, there arises a judicial, and not a political, question, even though its solution may involve the investigation of the acts of party conventions, caucuses, or committees. The question is, Has the public officer performed a duty required of him by law? and this question is always judicial, never political.

The question presented in the present case, therefore, being purely judicial, the inquiry, then, is whether this judicial question is one which comes within the original jurisdiction of this court. To my mind there is little difficulty in returning an affirmative answer to this question. In order to be within that jurisdiction, the question presented must be *publici juris,* and must be one affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of its people. *Att'y Gen. v. Eau Claire,* 37 Wis. 400. The general interest of the state at large must be involved, not alone a mere private right; although the fact that a private right is incidentally involved and may be vindicated by the judgment will not deprive the court of jurisdiction, providing that the public right is the right primarily to be enforced. *In re Court of Honor,* 109 Wis. 625, 85 N. W. 497.

That the question which of two rival state tickets shall appear on the official ballot as the regular ticket of a great political party is a question *publici juris,* I cannot doubt. That the decision of this question materially affects the liberties of the people and involves the general interests of the state at large, I can as little doubt. It is easy to say that so long as the names appear at some place on the ballot, so that the voter may designate them if he chooses, every reasonable requirement is satisfied. This argument was made in the case of *State ex rel. Runge v. Anderson,* 100 Wis. 523, 76 N. W. 482. It did not convince me then and it does not now. We live in the days of party government. Whether it be desirable

or not, we cannot escape it if we would. All the recent laws providing for official ballots and recognizing conventions and caucuses as *quasi*-governmental agencies have, in my judgment, made the party organization and the party name more powerful than ever. If the party name was important a quarter of a century ago, it is far more important now. We all know that if the name of John Doe goes on the official ballot in the column headed by the name of the dominant party he will in all reasonable probability be elected, while if it is put in another column it is equally probable that he will be defeated; not because of any difference in his intellectual, mental, or moral qualities, but simply because of the weight and influence of the party name and its hold upon the voters. In effect the question whether a ticket shall be successful or not often depends very slightly upon the ability or character of the nominees, but rather upon the party name which stands at its head.

In view of these well-understood conditions, the right to the use of the party name cannot reasonably be called a trivial right, nor the question who is entitled to its use an unimportant question. It is a question affecting the whole people, because upon its solution may depend the personnel of the government of the state as well as its policy for years. Such a question surely affects the "liberties of the people," and is of such importance that this court should not hesitate to assume jurisdiction when the question is properly presented, unless other considerations, now to be considered, forbid.

Before proceeding to these considerations, however, it is proper to remark that the relators were doubtless right in bringing their action in equity. *Mandamus* would not lie under the general rule laid down in the case of *State ex rel. Board of Education v. Hunter,* 111 Wis. 582, 87 N. W. 485.

It is not sufficient, however, that the question be *publici juris,* that it affect the liberties of the people, and that it be of sufficient public importance to move this court to exercise

its original jurisdiction, but it must also appear that there is no other efficient and adequate remedy in order to call for the interposition of the equitable powers of this court. In this respect the same rule applies to this court as applies to trial courts. It is now to be considered whether the legislature has provided another remedy.

The right to have the names of party nominees put on the official ballot under the party name is a right not existing at common law, but created by the statute. When a new right is created by statute, and the statute also provides a method by special tribunal for the enforcement of that new right, and says nothing about an appeal, it is well understood that the remedy so given is exclusive, provided always that the tribunal proceed without jurisdictional error. This principle is supported so uniformly by the books that it is not deemed necessary to cite many authorities. A few from Wisconsin will suffice. *Hall v. Hinckley*, 32 Wis. 362; *Smith v. Lockwood*, 34 Wis. 72; *State ex rel. Gill v. Watertown*, 9 Wis. 254; *State v. McGarry*, 21 Wis. 496; *State ex rel. Willis v. Prince*, 45 Wis. 610; *Gillan v. Board of Regents*, 88 Wis. 7, 58 N. W. 1042. It was optional with the legislature to give the right or withhold it entirely. Having given the right, it was entirely competent to subject it to such conditions, limitations, and remedies as in the judgment of the legislative body were wise and proper. The power to create a right necessarily includes the power to determine the conditions under which it shall be exercised and the remedies which may be invoked for its enforcement. *Daniels v. Racine*, 98 Wis. 649, 74 N. W. 553.

So the question is whether the legislature has created a special tribunal for the decision of controversies as to rights upon the official ballot, and this question brings me necessarily to the consideration of sec. 35, Stats. 1898, for this is the only section which can be claimed to have that effect. The first so-called "Australian Ballot" law in this state was ch. 248,

Laws of 1889. This law recognized party conventions and primary meetings as already existing instruments of political action, and provided for the certification of the nominees of such conventions and meetings to the proper public officers, and for the preparation of an official ballot containing the names of the nominees, arranged alphabetically under the designation of the offices for which they were respectively nominated. This law did not attempt to regulate the manner in which conventions or caucuses should be called or held, nor did it recognize party committees in any way, and it contained no provisions of any kind relating to the settlement of conflicts arising between factions of political parties as to representation upon the official ballot.

In the year 1891 the subject was again considered by the legislature, and ch. 379, Laws of 1891, was enacted, which, while following the general plan of the previous law, contained many changes and additions. It is not necessary to consider the changes and additions at length, but it is sufficient to say that it recognized for the first time the party committee, and provided for the certification of the names of the committee and its powers, as well as the names of the nominees; and that it also contained an entirely new section, numbered 8 in the act, entitled "Division of Parties." This section passed without change into the general revision of the election laws of the state passed in 1893 as ch. 288 of the Session Laws of that year, and later became, without substantial change, sec. 35 of the Statutes of 1898, where it is preceded by the catchwords "Candidates if Party Divided." The question to be decided is whether this section provides a tribunal for the decision of the present controversy.

When ch. 379, Laws of 1891, was passed the state had passed through two years of experience under the new ballot system. It is very manifest from the complete revision made by the last-named chapter that defects and omissions had been discovered in the law, and that a serious attempt

was made to remedy them. The law was evidently care-
fully drawn. It was said upon the argument that it was
drawn by the late Gen. Edwin E. Bryant; but, whether this
be true or not, the law itself bears inherent marks of much
intelligent care and deliberation, and nowhere is this more
evident than in the section under consideration. The mere
fact of the insertion of the section shows conclusively that the
danger of a dispute as to the right to the party name between
warring factions had been appreciated. It is not conceivable
that it was intended by the section to provide a method for
the decision of such controversies when they arose in one way
and to provide none when they arose in another way. The
very heading of the section, viz., "Division of Parties," indi-
cates clearly that it was intended to deal generally with all
cases of such division. It is also apparent from the section
that the intention was to have such questions settled out of
court by the political parties themselves. Indeed, it seems to
have been largely for this purpose that the party committee
was recognized by the law and given a place as a *quasi*-gov-
ernmental agency. If there was to be a party tribunal to set-
tle party difficulties, it must necessarily be a tribunal which
had continuous existence, or one which at least existed longer
than one or two days during a period of two years.

Another thing is apparent from the section, and that is that
it was intended that in all cases of dispute as to regularity of
rival conventions the call of the regularly elected party com-
mittee was to govern.

With these propositions, which seem to me self-evident, in
mind, let us examine the section. Is it obscure, or of doubt-
ful meaning? I confess that when I first read it I could see
no difficulty in construing it, nor have I been able to see any
such difficulty since that time. It then seemed and now seems
to me to be clear and simple; so clear and simple in fact as
not to need construction. The man who drew it had in mind
the settling of such controversies out of court, by the party it-

self, through the medium of its last acknowledged ruling body, namely, the party committee. With this idea in mind, he would naturally say to himself: "There are two well-defined classes of party splits or divisions: *first,* the split which occurs before the convention or caucus is called; and, *second,* the split which occurs after the call. In the first case there must be calls for two or more conventions emanating from different sources, only one of which is the call of the regularly constituted committee. In the second case there is necessarily but one call, and both conventions claim to be the convention so called. In both cases the controlling question to be decided is, Which convention was called by the regular party committee? In the first case this may be decided by a mere ministerial officer of the government, for he has only to consult his records and ascertain the names of the party committee, and then give preference of name to the nominees of the convention called by that committee. In the second case, however, there may be, and doubtless will be, serious difficulty in deciding which convention is in fact the one called by the proper committee. In this case let the very committee which concededly called the convention decide which convention is its offspring, and let that decision bind the certifying officer." It is apparent to my mind that this was the line of thought, and it is equally apparent that the section in plain words lays down the plan in simple and direct language which needs no construction. Take the first sentence of the section and consider it for a moment:

"In case of a division in a political party and a claim by two or more factions to the same party name, the officer . . . shall give preference of name to the convention or caucus thereof held pursuant to the call of the regularly constituted party authorities."

Is it not apparent that this covers, and was intended to cover, the first case before mentioned? Notice that it only covers a case of (1) a division in a party and (2) a claim by

each faction to the same party name. There is no suggestion that each faction claims to have held the convention called by the regular party committee; in fact this suggestion is negatived by the following clause, which allows a mere ministerial officer, who may himself be vitally interested in the question and a nominee on one of the rival tickets, to decide which convention was held pursuant to the party call. If this question is a question to be settled simply by the consultation of the records in the office of the officer, as will be the case in the situation first supposed, the section is reasonable and unobjectionable; otherwise not. If the clause is doubtful, and construction is necessary, this consideration furnishes ample reason for construing the first subdivision of the section to cover only a case of quarrel as to the use of party name, and not quarrel as to which of two conventions was the legitimate child of the party. Need of construction seems, however, to fade away utterly when we consider the next sentence of the section. Having provided for the simple case of a quarrel between factions as to the use of the party name, the author of the section, bearing in mind that the case might be further complicated by a quarrel as to which convention was really held pursuant to the regular party call, proceeded to provide for such a contingency. It seems very plain that this clause is merely an *addendum* to the preceding sentence. It evidently contemplates that the conditions named in the first sentence, namely, a factional division and rival claims to the party name, shall exist (though these are not expressly referred to), and, in addition, that each faction should claim that the convention held by it was the convention called by the regular party committee. Again, as tending to show that the second sentence is a mere *addendum* to the first, it is worthy of notice that no provision is expressly made in the second sentence authorizing the faction which is held to be irregular to present a party name, although it is manifest that in this case as well as in the case covered by the first sen-

tence the tickets of both factions are to go on the ballot, because the words "preference of designation" are used. There can be no preference in designation if but one ticket appears on the ballot.

My conclusion is that the two sentences are to be construed together; that the basic idea is that, in case of contest as to the right to use the party name, the test to be applied in all cases is, Which convention was called by the party committee? that in case the dispute is only as to the use of the name, it being admitted that only one convention was held under the call of the regular committee, the secretary of state simply turns to his records, ascertains who composed that committee, and certifies to the nominees of the convention called by it. This is a mere ministerial act, and if he declines to perform it he may doubtless be compelled to perform it by the courts. In case, however, the dispute is further complicated by both factions claiming to have held the regular convention under the regular call, then the committee which called the convention steps in and decides this question, and the secretary of state again performs the merely ministerial duty of certifying to the nominees of the convention which has thus received the stamp of regularity.

Thus construed, the two sentences seem to me to be as clear as language can well make them. They provide in a very reasonable way for the settlement out of court of all questions arising between factions as to the use of the party name. When I say "reasonable way" I say it advisedly. To me it seems entirely reasonable that the highest authority existing in the party at the time the party breach arises should decide which faction is regular; much more reasonable, indeed, than that such a contest should be submitted first to the judgment of a ministerial officer who may himself be involved in the dispute, and ultimately to the decision of a court which will be obliged to investigate charges and counter charges of fraud, which may, as in the present case, cover many printed pages,

and require weeks, and perhaps months, for their trial. In fact, the provision that the party committee shall settle the question is simply a legislative adoption of the rule frequently laid down by the courts in the absence of any legislation on the subject, namely, the rule that in merely party disputes the decision of the highest party authority shall govern. It is true that the party committee may decide unfairly. It is quite certain that it will not weigh evidence with the nicety and impartiality of the chancellor sitting in a court of equity. Party feelings run high, and the members of such a commit-tee are not usually selected because of their eminent judicial qualities. It is quite probable—nay, almost certain—that most of the members will have their minds already made up on this very question. But after all is said that may be said upon this line of argument, it must be admitted that it is a question which the party itself ought to settle. The law has recognized parties and endowed them with legal rights. It has made the voice of the party so potent as to control the ac-tion of a state officer in making up the ballot. When doubt or dispute arises as to what the voice of the party really is, why is it not reasonable to let the party, through its chief gov-erning body, decide the dispute, rather than turn the question over to the courts? Certainly, if rank injustice and wrong be committed, the great body of the electorate may ultimately be relied upon to correct it, and to correct it thoroughly and energetically, for

> "Ever the truth comes uppermost,
> And ever justice is done."

Indeed, it seems that temporary submission to some injus-tice is preferable to the adoption of a system which would make the courts the arbiters of contests between political fac-tions. Under such a system it may well be doubted whether our judicial elections would remain free from partisan pol-itics for any great length of time.

Probably I have devoted more time to the question of con-

struction than is justified, especially in view of the fact that
I stated in the beginning that I considered the section so plain
as to be incapable of more than one construction; but the
earnestness with which counsel urged upon us a different con-
struction has seemed to call for a somewhat extended dis-
cussion.

It goes without saying that, if the construction which I
have given be correct, the present case comes within the sec-
ond subdivision of the section, and presents a case to be de-
cided by the special tribunal created by that subdivision. It
follows that the jurisdiction of that tribunal is exclusive so
long as it acts within its jurisdiction, and this brings me to
the last serious question in the case.

It is argued by the relators that, even if the present case
comes within the second subdivision of the section, still the
tribunal established by that section is disqualified from act-
ing, and hence that the court may and should take up and de-
termine the controversy. The claim is that it is established
by the pleadings that a majority of the members of the old
committee are so interested in the result by reason of being
office-holders under the present administration, or are so
clearly prejudiced against the relators by reason of business
or political relations with the administration faction that they
are disqualified from sitting as members of the tribunal. The
claim is, further, as I understand it, that because the persons
so disqualified met with and participated in the proceedings
of the committee, any action taken by the committee was
thereby rendered void, and the committee thereby incapaci-
tated from again attempting to pass upon the contest.

Were this question a new one in this court it would open
up an interesting field for discussion and research; but it is
not new. The contention now made was made and overruled
in the case of *State ex rel. Starkweather v. Common Council*,
90 Wis. 612, 64 N. W. 304, and that case has been approved
by at least two cases decided since that time. *Nehrling v.*

*State,* 112 Wis. 637, 88 N. W. 610; *Wood v. Chamber of Commerce,* 119 Wis. 367, 96 N. W. 835. In the *Stark-weather Case* the question was whether upon a proceeding before the common council to remove the mayor of a city from office an alderman who preferred the charges and an alderman who would act as mayor in case the removal was made were disqualified from acting as members of the council upon the trial, and it was held that they were not. The ground taken was that an office is not regarded as property or as a vested right, and it is entirely competent for the legislature creating the office to provide for the removal of the officer by a body some of whose members may be prejudiced or moved by passion. The power of amotion from office is not a judicial, but an administrative, power, though to be exercised in a judicial manner; and hence the common council in removing the mayor was not acting as a court, but as an administrative body. It was there said:

"Passion and prejudice frequently play an important part in such proceedings as those before us, but in the absence of constitutional or legislative restrictions they do not disqualify the members of the removing board from acting."

If an office be not a vested right, and may be taken away by an administrative board, some of whose members are moved by passion or prejudice, surely the right to have a name appear upon the ballot can have no higher dignity or importance.

It may be admitted that to the mind of the lawyer, accustomed to deal only with courts, where freedom from interest or prejudice both on the part of the judge and of the jury is so highly prized and carefully protected, it seems somewhat startling that important rights should be dealt with and determined by a prejudiced body; but when the great number of such administrative bodies which are daily passing upon such questions is considered, it will at once be seen that, if every such body is to be considered disqualified whenever its

members have formed an opinion on a question pending before the body, or have close business or political relations with either party to a contest before it, the transaction of public business would be very seriously interfered with.    Take the various administrative boards, such as boards of review, school boards, boards of health, boards of examiners for admission to various professions, boards of canvassers, and the numerous similar bodies, all or nearly all of which are obliged to pass upon disputes between parties, or at least to determine whether a citizen is entitled to exercise a right which he claims—and endeavor to subject all of these administrative bodies to the rule here invoked, and it will be at once seen that such an attempt would result in such embarrassment in the transaction of business as would necessitate the immediate passage of additional legislation authorizing the calling in of temporary officials or the adoption of some other expedient whenever one of these newly discovered affidavits of prejudice is made.

But it was said upon the argument that the doctrine of the *Starkweather Case* had been seriously impaired, if not overruled, by the case of *State ex rel. Getchel v. Bradish,* 95 Wis. 205, 70 N. W. 172.    In that case it was held that a member of a town board, who had hired a minor to purchase whisky of a saloon keeper in violation of law, was incompetent to sit as a member of the town board in trying the question whether the saloon keeper's license should be revoked for that illegal act.    The decision was put upon the ground that the license was a vested property right, and it was expressly said that the *Starkweather Case* was clearly distinguishable. Whether that decision was well founded or not, it cannot be said to have overruled the *Starkweather Case,* especially in view of the fact that the latter case has been twice expressly approved since the *Bradish Case* was written.    The relators claim, however, that the *Starkweather Case* is against the weight of authority, and, if it be held applicable to this case,

should be overruled; and to this claim some attention should be given. That case was not decided upon mere first impressions, nor without serious consideration and study. The importance of the principles involved was fully appreciated and an honest effort was made to determine it in accordance with the law. Nevertheless, this court is but human and is liable to err, and though the rule of *stare decisis* may well be invoked in favor of the holding in that case, still in a case of this importance a re-examination of the position there taken seems very proper.

It is well first to note the nature of the objections made to the members of the committee alleged to be disqualified. No member of the committee was nominated for office by either convention, nor was any relative of any member of the committee nominated. No member of the committee is financially interested in the controversy. It is not shown that any member will gain or lose a dollar, whatever be the result of this contest. Really the sole objection is that the majority of the committee are adherents of the administration faction and have prejudged the controversy. If the same rule were to be applied to this tribunal as was applied at common law to judges, not a member of the committee would be disqualified. At common law the only grounds upon which a judge could be excluded from trying a case were interest and, possibly, consanguinity or affinity. *Case v. Hoffman,* 100 Wis. 314, 72 N. W. 390, 74 N. W. 220, 75 N. W. 945, see 100 Wis. 356, 74 N. W. 221. This latter ground is denied by many authorities. *In re Dodge & S. Mfg. Co.* 77 N. Y. 101. But the question is not at all material here, as no consanguinity or affinity is charged. The interest, in order to be a disqualification, must be a pecuniary interest. *Hungerford v. Cushing,* 2 Wis. 397. There is no pecuniary interest shown here. The possibility that if one faction succeeds and its ticket is elected a committeeman may at some time in the future lose a position which he now holds, cannot be called a pecuniary inter-

est. But it seems to be claimed that mere prejudgment of the case will disqualify the committee, as in case of a juror, it not being claimed that the committee acted maliciously or fraudulently in making their decision, any further than that there may perhaps be an inference of fraud resulting from the claim of prejudice on the part of the committee.

Before proceeding to the authorities, a few words on the legislative intention may be pertinent. Considering the well-known partisan character of political committees, can it be supposed for a moment that the legislature, in erecting this tribunal, imagined that the questions submitted to it would ever be adjudicated with a nice regard for legal rights and in a strictly judicial manner? Did not the legislature know, as we all know, that in case of a violent breach and factional fight in a party the same fight would doubtless exist in the committee itself, and that all members would necessarily prejudge the contest? I confess that there seems to me but one answer to these questions and that in the affirmative, and hence it seems to me that the legislative intent in passing sec. 35 was not to obtain a judicial decision from a nonpartisan court, but to ascertain the choice of the highest authority in a party; the presumption being that the majority of the committee fairly represent the majority of the party. This seems the more probable because not the slightest provision is made for the giving of notice to the contending factions of any hearing before the committee. So far as appears from the section itself, it is entirely reasonable to conclude that the committee was expected to make the certificate without hearing, basing their decision simply upon their own knowledge.

But assuming that the intention was that there should be a hearing before this administrative tribunal, conducted in a judicial manner, does the fact that a majority of its members were prejudiced deprive the committee of power to hear and decide the contest, and render void its decision? There are unquestionably authorities, which, if followed, would neces-

sitate an affirmative answer to this question. They are quite fully reviewed in the opinion of the court, and any extended further discussion would scarcely be helpful. It may be said ·of these cases, however, that as a general rule they proceed upon the theory that the tribunals with which they deal are in the true sense judicial tribunals, and starting from this basic proposition they easily reach the conclusion of disqualification of members by reason of interest or prejudice. This proposition has been distinctly repudiated in this state, as already shown, and the very palpable and numerous difficul-·ties which would at once arise in the transaction of business ·by the numerous administrative boards of the state will not ·allow us to consider for a moment the idea of retracing our steps and adopting the rule so contended for. In none of the ·cases, so far as we can discover, has any serious attention been ·given to the undeniable proposition that when a right is solely the creature of statute, it may be given with such limitations and subject to such conditions as the power which gives it ·chooses to attach to it. In some of them, however, the prin-·ciple of necessity, in order to prevent a failure of remedy, is recognized, and this leads to the second line of cases, very large in number, where the sitting of prejudiced or interested members of such tribunals, and even of courts, has been upheld on the ground of necessity. This court has recognized this rule as applicable to a circuit judge. *Jefferson Co. v. Milwaukee Co.* 20 Wis. 139. There is, of course, nothing new in the rule. It runs back to the Yearbooks themselves. Conceding the tribunal here to be a judicial instead of an administrative body, this rule must be applied in order to save the remedy which the law has made exclusive of all others; and so, even if we felt obliged to recede from the broad ground ·taken in the *Starkweather Case,* the same result would be reached in the present case by the application of the rule of ·necessity, it appearing that a majority of the entire committee is prejudiced and no action being possible unless the prej-

udiced members participated in the decision.  Thus we reach
the same result as before.  However we look at it, the decision
of the committee, prejudiced though its members may be, is
final and not to be overturned by the courts except possibly
for failure to obtain or keep jurisdiction, which does not ap-
pear here.

In discussing the case I have endeavored to consider it
purely in its legal aspects.    So looking at it, I have not
reached nor shall I consider the charges and counter charges
of fraud and wrongdoing contained in the pleadings.   There
are a few general observations, however, which the presence
of these charges, coupled with the refusal to entertain the
case by this court, seems to render appropriate here.   It is
quite often said that there is or should be a remedy for every
wrong, and the idea is frequently more or less vaguely ex-
pressed that when a court thus refuses to entertain jurisdic-
tion of a controversy on the grounds here stated there has been
a failure by the court to perform the functions for which only
it exists, and a consequent loss by the citizen of legal or con-
stitutional rights which it was the duty of the court to con-
serve.   Every good citizen wishes to see exact justice done,
and the idea that cases may arise where charges of wrong and
oppression will be refused a hearing, and the alleged injured
parties turned from the doors of the temple of justice, is
repugnant to that natural sense of justice which prevails so
extensively among the citizens of a government like ours.
Our constitution provides that:

"Every person is entitled to a certain remedy in the laws
for injuries or wrongs which he may receive in his person,
property, or character.   He ought to obtain justice freely and
without being obliged to purchase it, completely and without
denial, promptly and without delay, conformably to the laws."
Sec. 9, art. I, Const.

This provision was certainly intended to preserve to the
citizen every legal right, whether arising from common-law
principles or granted by the constitution itself, and to require

that proper remedies be furnished in the courts for the infraction of such rights. Starting from this basis the argument is, in the present case, that the voters had a right to join the party and participate in its caucuses and conventions, and hence have a right to the assistance of the courts when they allege that the delegates for whom they voted and who were rightfully elected have been denied seats in the state convention of the party. The argument is specious, but it will not bear close analysis. The trouble is that the right to vote in a caucus or convention is neither a common-law right nor a right conserved or granted by the constitution. A moment's thought will convince any one of this fact. The common law knew no such thing as the rights of a party or the rights of a voter to coerce any particular party action. The party grew up by slow degrees and, until the passage of the recent ballot laws, was a purely voluntary association into which men came and from which they went with perfect freedom according as their views agreed or disagreed with those of the organization. If the party pleased them they stayed within its folds; if it displeased them they went elsewhere. Its caucuses and conventions were held and governed under rules adopted by the party itself without thought of control or interference on the part of the government or the law. If a voter felt that a convention or caucus had been captured by fraud or force, he could refuse to be bound by it. He could go to the opposing party, vote independently, or refuse to vote at all; but he had.no remedy in the courts. Before the passage of the ballot laws, by which the party caucuses and conventions were recognized as *quasi*-governmental agencies, it is believed no voter or candidate ever appealed successfully to the courts to set aside the result of a convention or for the right to use the party name to the exclusion of others.

And so when our constitution was adopted and, by its terms, recognized as law all such parts of the common law as were then in force not inconsistent with the constitution itself

(sec. 13, art. XIV), it did not thereby recognize any right on the part of the voter or the candidate to bring action in court to determine whether a caucus or convention was legally held, or which of two conventions was the true convention of the party. Nor did the constitution, expressly or by implication, recognize the existence of parties or party rights. Its sections will be searched in vain for any mention of them. Electors are defined, classified, and their rights to vote fixed and guarded; but parties are completely ignored. They are left as mere voluntary associations which voters may join if they choose, but which, like other such associations, the law will allow to manage their own concerns just as their members may choose without interference so long as the laws of the land be not violated.

So it seems to be a demonstration that the rights which are charged to have been violated by the complaint in this case are neither common-law nor constitutional rights. They are simply, then, rights which have been created by the ballot laws themselves. But if created by the ballot laws they are necessarily governed by the ballot laws. The legislature had the right to recognize the party and its conventions and caucuses, and endow them with rights just so far as it chose. It could withhold recognition entirely, or it could give such measure of partial recognition as it pleased. None could complain of the refusal to give greater recognition or fuller rights, because the legislature was the sole judge, in the absence of constitutional restrictions, as to what rights should be given. The right to have the names of nominees placed on the official ballot was limited by the provision requiring all contests as to the right to be settled by the former committee of the party. The party and all who claim to be its nominees must take the statute as it is given them. If they assert rights under one section of the law, they must also accept the limitations and conditions attached to those rights by another section of the law. They cannot take one part of the law and reject another.

And so it seems to me that the claim that constitutional or common-law rights have been infringed in the present case by the creation of a tribunal which may be prejudiced is entirely without foundation. The right to vote at an election is a constitutional right, but the right to vote at a party caucus or convention or to use the party name upon the ballot is not a constitutional right, nor was it known to the common law.

The contention that the decision of the national convention is conclusive on the question of party regularity is to my mind very easily disposed of. The statutes of this state must, of course, outweigh in authority the conclusions of any mere voluntary association, however large or respectable. If, as we conclude, the case comes within the second clause of sec. 35, and the tribunal thereby created is not disqualified, the question is closed. The legislature had the right to choose for itself what party tribunal it would recognize as the highest party authority, and has done so. It may further be noted that the political party as named and regulated in the statutes is purely a state organization; it is an organized body of voters *within the state* which cast at least one per cent. of the total vote at the last general election. Sec. 30, Stats. 1898. I do not find that the voluntary association of voters extending through all the states which is known as the national party is anywhere mentioned in the law. When, therefore, the highest authority in the party is spoken of and the claim is made that its decision is final as to contentions arising under the election law, must it not be the highest authority in the state organization or party which the law recognizes, not the highest authority in a foreign voluntary organization not known to the law? If this question be answered in the affirmative, then the decision of the national Republican convention cuts no figure. But however it may be answered, the law of the state must control, and I can see no escape from the conclusion that the decision of the committee was final and conclusive, and hence that the complaint states no cause of action.

The following opinion was filed October 20, 1904:

CASSODAY, C. J. (*dissenting.*) I am forced to dissent respectfully from the conclusion of by brethren as to the construction and effect of section 35 of the Statutes of 1898. In my judgment, the case presented comes squarely within and answers every call of the first clause of that section, which is copied in full into the conclusions of the court. The essential parts of the clause are to the effect that it applies whenever there is "a *division* in any political party and a *claim* by two or more *factions* thereof to the same party name," in which case the secretary of state is therein "required" in "preparing ballots" to "give preference of name to the convention . . . thereof held pursuant to *the call* of the regularly constituted" state central committee. Here it is undisputed that all of the delegates were elected, or claimed to have been elected, under the same call, and to have assembled pursuant to that call; and, after having so assembled, they divided into two parts or factions, each of which held a convention by itself and nominated a state ticket, and each claimed that it was entitled "to the same party name" on the official ballot. Nothing could be added to make it more specific or more complete, when applied to a party so split or divided into factions. It is, in effect, conceded that the duties of the secretary of state, as thus prescribed by that clause of the section, are ministerial, and hence subject to the control of the court. But it is claimed, as I understand, that the scope of the first clause of the section is supplemented and enlarged by the general language of the second clause of the section. It must be conceded that the language of that clause is very broad and general, and upon its face is free from limitations. It declares, in effect, that "when two or more conventions . . . shall be held and the nominations thereof certified, each claiming to be the regular convention . . . of the same political party, pref-

orence in designation shall be given to the nominations of the one certified by the committee"—meaning the prior state central committee. There is an absence in that clause of any mention of "a division in any political party," or "a claim by two or more factions thereof to the same party name," or the giving of "preference of name to the convention . . . held pursuant to the call of the regularly constituted party authorities," all of which are expressly mentioned in the first clause and particularly applicable to the conditions present in the case at bar. In my judgment, the general language of the second clause was intended by the legislature to cover, and does in fact cover, cases not specifically provided for in the first clause. Certainly such cases may be readily supposed, whether the "two or more conventions" are held by separate and independent organizations or as the result of a split in a political party and the organization of the respective factions years before the controversy arises. If the nominations made by such conventions were provided for at all, it must necessarily have been by the second clause of the section. To my mind, it would be absurd to hold that that clause was not enacted for the purpose of covering such cases, or that it was enacted to cover a case already provided for in the first clause of the section.

It is true that the words "two or more conventions," mentioned in the second clause of the section, are very general and broad enough to include the convention held by each of the two contending factions in the case at bar; but in my judgment they cannot be so construed when subjected to the well-established canons of construction. Thus it is said by a standard text-writer that:

"Where a general intention is expressed, and the act also expresses a particular intention incompatible with the general intention, the particular intention is to be considered in the nature of an exception; while, if a particular thing be given or limited in the preceding parts of a statute, this shall not

be taken away or altered by any subsequent general words of the same statute." Dwarris, Statutes (2d ed.) 514.

To the same effect, *Stockett v. Bird's Adm'r,* 18 Md. 484, 488, 489; *McFarland v. State Bank,* 4 Ark. 410; *State v. Rackley,* 2 Blackf. 249. The rule is perhaps stated as tersely in a Michigan case as in any, and it was there said and held that "the familiar rule for the construction of statutes" is that:

"Where there are two acts or provisions, one of which is special and particular and certainly includes the matter in question, and the other general, which, if standing alone, would include the same matter and thus conflict with the special act or provision, the special must be taken as intended to constitute an exception to the general act or provision, *especially when such general and special acts or provisions are contemporaneous,* as the legislature are not to be *presumed* to have intended a conflict." *Crane v. Reeder,* 22 Mich. 323, 333, 334.

That language of the Michigan court has been quoted with approval in a late case in the supreme court of the United States. *Rodgers v. U. S.* 185 U. S. 83, 87–89, 22 Sup. Ct. 582. In this last case the rule was applied even to a general act passed subsequently to the special act. Mr. Justice BREWER, speaking for the whole court, there said that:

"It is a canon of statutory construction that a later statute, general in its terms, and not expressly repealing a prior special statute, will ordinarily not affect the special provisions of such earlier statute. In other words, where there are two statutes, the earlier special and the later general, the terms of the general broad enough to include the matter provided for in the special, the fact that the one is special and the other is general creates a presumption that the special is to be considered as remaining an exception to the general, and the general will not be understood as repealing the special unless a repeal is expressly named, or unless the provisions of the general are manifestly inconsistent with those of the special."

In support of such statement he cites *Fitzgerald v. Champneys,* 2 Johnson & Hem. 31, 54, 55; *Thorpe v. Adams,* L. R.

6 C. P. 125; Black, Interpretation of Laws, sec. 116; Sedgwick, Construction of Stat. & Const. Law, 98. See, also, *Pearce v. Bank of Mobile,* 33 Ala. 693; *Fosdick v. Perrysburg,* 14 Ohio St. 473 (5); *Brown v. County Commissioners,* 21 Pa. St. 37.

If the rules of construction thus quoted are applicable to the provisions of sec. 35 in question—and I think they are,—and if my conclusions as to the facts of the case presented are correct—and I believe they are,—then the second clause of the section has no application, and the state central committee had no jurisdiction to determine the controversy in question. In other words, the official ballots should be prepared by the secretary of state under the first clause of the section, subject to the control of the court.

There is another phase of the question calling for consideration. Assuming that my conclusions are wrong, and that my brethren are right in holding that the second clause of the section is applicable to the case presented, still I would be constrained to dissent from the proposition that the state central committee had exclusive jurisdiction to determine the controversy. In reaching this conclusion I do not now and here lay special stress on what seems to be conceded by my brethren, and what I understood, in effect, was conceded by counsel for the defendant at the bar, and that is that the committee was biased and prejudiced by reason of partisan affinity and its former action in the matter, nor upon the fact that some of the committee were directly interested in the result by reason of holding office by appointment from officials who had been thus renominated and to whom such committeemen were answerable. Counsel for the relators have certainly cited numerous adjudications holding that such bias, prejudice, and interest were sufficient to disqualify a person from acting as a member of such tribunal; and the case upon which counsel for the defendant seem to specially rely is to my mind broadly distinguishable. *State ex rel. Starkweather v. Common Coun-*

*cil,* 90 Wis. 612, 64 N. W. 304. The paramount objection, to my mind, is that the power and authority thus ascribed to the state central committee in effect deprives the voters of the fundamental and constitutional right of being represented in the state convention of the party to which they belong by delegates of their own choice.

To avoid being misunderstood, it may be well to mention a few facts admitted in the record. The call for the state convention, issued by that committee, "requested that credentials of delegates elected" to that convention should "be certified to the state central committee by the chairman and secretary of the county committee," for the reason, as therein stated, that "the state central committee" would "act *as the committee on credentials."* That call was for 1,065 delegates, each of whom, according to the call, would represent, or be supposed to represent, "250 Republican votes, or the major fraction thereof." It appears that about 1,000 of the delegates claiming the right to seats in the convention held certificates from the chairman and secretary of their respective county committees, to the effect that they had been duly elected as such delegates; but the right to seats of several of them were contested. The balance of those claiming seats in the convention held defective certificates. It appears that on the day prior to the convention, and pursuant to notice, the state central committee met to act "as the committee on credentials" and to hear the respective claims to such contested seats and defective certificates, and to make findings thereon to be reported to the convention. No serious objection to such action of the committee seems to be made. The objection is that the committee went further and, as seems to be admitted by the pleadings, determined in advance just what delegates should be allowed to enter the hall of the convention and participate in the organization thereof, and that all others should be excluded from the convention; and that among those so excluded were a large number of delegates who had been duly

"certified to the state central committee by the chairman and secretary" of their respective county committees that they had been so elected; and that in place of those so excluded a like number of persons holding no such certificates were admitted as delegates to the convention and participated in its organization. This is made certain by the admitted fact that before the meeting of the convention the state central committee, acting as a committee on credentials, *resolved* "that no person be admitted to that part of the convention hall assigned for delegates except those whose names appear on the roll of delegates *prepared by this committee* and who have such badges (provided by the sergeant at arms) to identify them as such, and that the sergeant at arms be instructed to carry this resolution into effect;" and it is admitted that he did carry that resolution into effect.

The state central committee, acting as such committee on credentials, certainly had no greater power than they would have possessed if they had been delegates in the convention and as such had been appointed by the convention as a committee on credentials. As such they were merely to advise and aid the convention, and were necessarily subordinate to and subject to the control of the convention. The delegates so properly certified to have been duly elected represented, or were supposed to represent, Republican voters, and as such were entitled to participate in the organization of the convention. If the committee which did not so represent Republican voters, but derived its authority solely from a former convention, could thus step in prior to the convention and exclude forty-nine or any other number of delegates so properly certified from entering the convention hall, and thus preclude the electors who sent them from being represented in the convention, then it was because the committee had power superior to the convention itself. The power thus exercised by the committee was not conferred upon it by the convention, but was assumed by the committee itself. This is a representative

government, and in my judgment no authority can be given to such committee to thus obstruct and destroy such right of representation; and much less can it be assumed and rightfully exercised. As I read the record, it was the exercise of such unlawful authority by the committee that was the sole cause of the split in the convention which resulted in holding two separate conventions and nominating two separate tickets for state officers.

As I understand, this court has not undertaken to determine which of the two conventions was composed of a majority of the rightfully elected delegates. On the contrary, the court holds, as I understand, that the certificate of the committee as to the regularity of the Gymnasium convention is conclusive upon the court. Of course, if that is correct, it would have been equally conclusive had they certified to the regularity of the Opera House convention. The whole question is thus made to turn upon the power of the committee, and not upon the question whether the one convention or the other was composed of a majority of the rightfully elected delegates. If such action of the committee in excluding from the convention such properly certified delegates and admitting others in their places, in May, was unlawful, then in my judgment it could not be made lawful by such certificate from a majority of such committee in September. To bar from the convention, even for the purposes of organization, the rightful representatives of voters, is, as it seems to me, in effect to bar out the voters who sent them. The right to select candidates for office through representatives is just as sacred as the right to elect officers from the candidates so selected. The constitution declares who "shall be deemed a qualified elector." Sec. 1, art. III, Const. ;*State ex rel. Hunt v. Stafford,* 120 Wis. 203, 97 N. W. 923. It has often been held that the legislature cannot add to such qualifications, nor take the right of suffrage away from one so qualified. *State ex rel. Knowlton v. Williams,* 5 Wis. 308; *State ex rel. Cothren v.*

*Lean,* 9 Wis. 279; *State ex rel. Wood v. Baker,* 38 Wis. 71;
*Dells v. Kennedy,* 49 Wis. 555, 6 N. W. 246. It has often
been said, and never successfully contradicted, that the right
to vote includes the right to have the vote counted. So the
right to choose delegates to a state convention includes the·
right to have such properly certified delegates admitted to·
such convention, at least for the purposes of organization.
To allow such exclusion of properly certified delegates, even
by an impartial and disinterested committee, would, in my
judgment, be a subversion of representative government, so·
far as political parties acting through state conventions are·
concerned.

In writing this opinion I have confined myself strictly to
what I regard as the legal questions presented by the facts·
admitted in the record, and upon which, under the decision-
of the court, the case has been made to turn. It is unneces--
sary to say more.